**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIERRA CLUB,<br><br>                Plaintiff,<br><br>    v.<br><br><br>STEPHEN L. JOHNSON, in his<br>official capacity as Administrator,<br>United States Environmental<br>Protection Agency<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:07-cv-1040-ESH |

**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Sierra Club, moves the Court, pursuant to Federal Rules of Civil

Procedure 56(a) and (d) and Local Rules 7 and 56.1, for Summary Judgment against

Defendant Stephen L. Johnson, the Administrator of the United States Environmental

Protection Agency ("Administrator").  The grounds for this Motion are set forth in the

attached Points and Authorities, Proposed Findings of Fact in Support of the Motion,

and the affidavits and evidentiary materials provided with the Motion.

The Administrator has violated the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, by

failing to comply with his mandatory duty to respond to a Petition filed by Sierra Club,

pursuant to 42 U.S.C. § 7661d(b)(2), within the 60 days provided by law for a response.

42 U.S.C. § 7661d(b)(2). This violation is ongoing and will not be remedied without an Order from this Court.

Dated : July 20, 2007

Respectfully submitted,

Attorneys for Plaintiffs.

GARVEY MCNEIL & MCGILLIVRAY, S.C.

s/ David C. Bender
David C. Bender
D.D.C. Bar. No. WI
634 W. Main Street, Suite 101
Madison, WI 53703
Tel. (608) 256-1003
Fax (608) 256-0933
bender@gmmattorneys.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                                          |     |                                   |
| -------------------------------------------------------- | --- | --------------------------------- |
| SIERRA CLUB,                                             | )   |                                   |
|                                                          | )   |                                   |
|                               Plaintiff,                 | )   |                                   |
|                                                          | )   |                                   |
|                                                          | )   |                                   |
|                  v.                                      | )   |                                   |
|                                                          | )   |                                   |
|                                                          | )   | Civil Action No. 1:07-cv-1040-ESH |
|                                                          | )   |                                   |
| STEPHEN L. JOHNSON, in his                               | )   |                                   |
| official capacity as Administrator,                      | )   |                                   |
| United States Environmental                              | )   |                                   |
| Protection Agency                                        | )   |                                   |
|                                                          | )   |                                   |
|                               Defendant.                 | )   |                                   |
|                                                          | )   |                                   |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT**

Pursuant to Fed. R. Civ. P. 56 and Rule LCvR 7(h), Plaintiff Sierra Club, by its counsel, Garvey McNeil & McGillivray, S.C., provides the following statement of material facts to which there is no genuine issue:

1.     Plaintiff, Sierra Club, is an incorporated, not-for-profit corporation that has its headquarters at 85 Second Street, 2nd Floor, San Francisco, California.  (Nilles Dec. ¶ 5.)

2.     Sierra Club also keeps offices and has members in the District of Columbia and Wisconsin.  (Nilles Dec. ¶ 5.)

3.    One of Sierra Club's purposes is to preserve, protect, and enhance the natural environment.  (Nilles Dec. ¶ 6.)

4.    Sierra Club works to influence public, private, and corporate policies through programs at the local, state, national, and international levels to reduce the amount of pollution in the environment through the use of legal procedures.  (Nilles Dec. ¶ 6.)

5.    The Defendant, Stephen Johnson, is the Administrator of the United States Environmental Protection Agency ("Administrator").  (Nilles Dec. ¶ 8.)

6.    Wisconsin Public Service Corporation operates a power plant in Marathon County, Wisconsin, called the Weston Generating Station or "Weston."  (Nilles Dec. ¶ 4.)

7.    The power plant is the source of emissions of numerous pollutants that are harmful to human health.  (Nilles Dec. ¶¶ 11-12.)

8.    Sierra Club's members live in the State of Wisconsin and live, work, and recreate around the Weston power plant.  (Nilles Dec. ¶¶ 7, 11.)

**Administrator Johnson's Failure to Respond to Sierra Club's Petition**

9.    On July 17, 2006, Sierra Club submitted public comments on a draft Title V operating permit for the Weston power plant, to the Wisconsin Department of Natural Resources ("DNR").  (Nilles Dec. ¶ 28.)

10.    DNR did not correct the Weston permit and proposed the permit to the United States Environmental Protection Agency on October 3, 2006.  (Nilles Dec. ¶ 29, Ex. 2.)

11.    The Administrator did not object to the permit, as proposed by DNR, within 45 days after October 3, 2006.  (Nilles Dec. ¶¶ 29-30.)

12.    On November 20, 2006, Sierra Club petitioned the Administrator pursuant to 42 U.S.C. § 7661d(b)(2) to object to the permit.  (Nilles Dec. ¶¶ 31-32, Ex. 3.)

13.    Sierra Club's petition seeks permit limits requiring lower emission from and additional monitoring and recordkeeping by the Weston plant.  (Nilles Dec. Ex. 3.)

14.    More than 60 days have passed since Sierra Club submitted its petition to the Administrator.  (Nilles Dec. ¶ 34.)

15.    The Administrator has not responded to Sierra Club's petition.  (Nilles Dec. ¶ 35.)

**Injury to Sierra Club and Its Members**

16.    If the Administrator grants Sierra Club's petition, it should result in less air pollution emissions that are harmful to Sierra Club members' health, aesthetic interests and interests in healthy ecosystems.  (Nilles Dec. ¶ 11-12.)

17.    Sierra Club member Richard Wentzel ("Wentzel") lives approximately 15 miles from the Weston plant and regularly visits the area around the plant.  (Wentzel Dec. ¶¶ 3-8.)

18.      Wentzel observes the Weston plant and sees pollution coming from it. (Wentzel Dec. ¶ 5.)  He finds the pollution very ugly and aesthetically displeasing.  (Id.)

19.      Sierra Club members, including Wentzel, worry that the Weston plant is emitting more pollution than the law allows because the Weston plant's permit is deficient.  (Nilles Dec. ¶¶ 12, 15; Wentzel Dec. ¶¶ 4, 8.)

20.      If the Administrator grants Sierra Club's petition, it will result in additional monitoring and reporting of the pollution from the Weston plant that Sierra Club uses to inform itself and its members and will reduce or eliminate Sierra Club members' fear of illegal pollution from the Weston plant.  (Nilles Dec. ¶¶ 13-16.)

21.      If the Administrator denies Sierra Club's petition, Sierra Club can seek review by the United States Court of Appeals.  (Nilles Dec. ¶ 18.)

22.      If the Administrator grants Sierra Club's petition, Sierra Club can participate in the further permit proceedings on a revised permit and can enforce the provisions of a revised permit.  (Nilles Dec. ¶ 17-21.)

23.      The Administrator's failure to grant or deny Sierra Club's petition causes injury to Sierra Club because it results in additional pollution harmful to Sierra Club members, and frustrates Sierra Club's ability to further exercise its procedural rights to participate in permit revision proceedings before the state agency, seek judicial review of the Weston permit's terms, and enforce a revised permit's terms.  (Nilles Dec. ¶¶ 11-21; Wentzel Dec. ¶¶ 4-8.)

**Notice**

24.     On April 4, 2007, Sierra Club gave notice of its intent to sue the Administrator pursuant to CAA § 304(b)(2), 42 U.S.C. § 7604(b)(2), and 40 C.F.R. Part 54.  (Nilles Dec. ¶¶ 23-26, Ex. 1.)

25.     More than 60 days passed between the date that Sierra Club provided its Notice of Intent to File Suit to the Administrator and others and the commencement of this action.  (Nilles Dec. ¶¶24, 27, Ex. 1.)

Dated:  July 20, 2007

Respectfully submitted,

GARVEY MCNEIL & MCGILLIVRAY, S.C.

s/ David C. Bender
David C. Bender
D.C. Dist. Bar No. WI

634 W. Main Street, Ste 101
Madison, WI 53703
Phone (608) 256-1003
Fax (608) 256-0933
Bender@gmmattorneys.com

Attorneys for Plaintiffs.

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:07-cv-1040-ESH |
| | ) | |
| STEPHEN L. JOHNSON, in his | ) | |
| official capacity as Administrator, | ) | |
| United States Environmental | ) | |
| Protection Agency | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is a "citizen suit," under the Clean Air Act, to compel the Administrator of the United States Environmental Protection Agency ("EPA") to comply with his mandatory duty. Congress established a procedure whereby concerned citizens can petition the Administrator to object to an operating permit for a major source of air pollution issued by a state permitting agency when the citizens believe that the permit violates federal law. Clean Air Act of 1990 § 502, 42 U.S.C. § 7661d(b)(2). Congress intended that such petitions not languish before the Administrator, so it explicitly commanded the Administrator to grant or deny the petitions within 60 days after the

petition is filed. 42 U.S.C. § 7661d(b)(2).    Because the Wisconsin Department of

Natural Resources violated federal law when it proposed an operating permit for the

Weston Generating Station power plant ("Weston") to EPA, Sierra Club submitted a

petition to the Administrator asking the Administrator to object.  Despite the

requirement that the Administrator respond within 60 days, and the fact that eight

months have passed, the Administrator has not granted or denied the permit.

Therefore, Sierra Club had no option but to bring this suit to compel the

Administrator to act.

Because there are no issues of contested fact regarding the Administrator's

failure to respond to Sierra Club's petition, Sierra Club respectfully requests an order

from this Court granting summary judgment and requiring the Administrator to

respond to Sierra Club's petition without further delay.


## STATEMENT OF FACTS

Sierra Club is a non-profit environmental corporation that works to protect its

members, and others, from the harmful effects of air pollution.  (Pl. Prop. Facts ¶ 1.)

Sierra Club members live, work, and recreate in the area around the Weston power

plant located in Marathon County, Wisconsin.  (Pl. Prop. Facts ¶ 8.)  These members

are affected by the air pollution from the Weston plant, including exposure to harmful

chemicals like sulfur oxides and mercury.  (Pl. Prop. Facts ¶¶ 17-19.)  The members

are reasonably concerned that the emissions from the Weston plant are inadequately controlled and inadequately monitored.  (Pl. Prop. Facts ¶¶ 19-20.)  These concerns would be allayed if the Administrator responded to Sierra Club's petition.  (Pl. Prop. Facts ¶¶ 20-23.)

To carry out its purpose of reducing air pollution, Sierra Club petitioned the Administrator to object to a Title V operating permit proposed by the Wisconsin Department of Natural Resources ("DNR") for the Weston power plant.  (Pl. Prop. Facts ¶¶ 12-13.)  Sierra Club submitted its petition to the Administrator on November 20, 2006.  (Pl. Prop. Facts ¶ 12.)  More than 60 days have passed and the Administrator has not responded to the petition.  (Pl. Prop. Facts ¶¶ 14-15.)

The Administrator's failure to respond to Sierra Club's petition deprives Sierra Club's members of the likely results of a response by the Administrator, including less air pollution to be breathed by Sierra Club members and increased monitoring of the Weston plant.  (Pl. Prop. Facts ¶¶ 16, 20, 23.)  Sierra Club's members have a reasonable fear that the Weston plant, and the permit proposed by the Wisconsin Department of Natural Resources, are not in compliance with the Clean Air Act and that this noncompliance creates health risks and uncertainty for them.  (Prop. Facts ¶¶ 18-20.) When the Administrator acts on Sierra Club's petition, the Weston permit will be changed to comply with the Act, which will remedy Sierra Club's injuries.  42 U.S.C. § 7661(d)(b)(3).  Additionally, once the Administrator grants or denies Sierra

Club's petition, Sierra Club can exercise its statutory rights to further participate in permit proceedings before the state agency or seek judicial review, as necessary, of the Administrator's decision on the petition. (Pl. Prop. Facts ¶¶ 21-23.)

Sierra Club gave notice of its intent to bring this action against the Administrator on April 4, 2007. (Pl. Prop. Facts ¶ 24.) More than 60 days passed between the date that Sierra Club sent its notice of intent to sue and Sierra Club's filing of the Complaint in this action. (Pl. Prop. Facts ¶¶ 24-25.)

## STATUTORY OVERVIEW

The Clean Air Act is intended "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). To better carry out this intent, Congress amended the Clean Air Act in 1990 to create an operating permit program that requires all major sources of air pollution to obtain and comply with a permit to operate. *See* 42 U.S.C. §§ 7661-7661f. Because this program is located in Title V (five) of the Clean Air Act, and the regulations implementing the program are located in 40 C.F.R. Part 70, the operating permits are called either "Title V permits" or "Part 70 permits." 42 U.S.C. § 7661a(a); 40 C.F.R. pt. 70.

Title V permits are intended to collect and consolidate air pollution limits from other provisions of the Clean Air Act, and to establish a program of air pollution monitoring and reporting to ensure continuous compliance with such limits. *Sierra Club v. Johnson*, 436 F.3d 1269, 1272 (11th Cir. 2006). Title V permits thus ensure regulatory

agencies and the public that the facility is operating in compliance with the Clean Air

Act. *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996); *see generally* S. Rep. No. 101-228

at 346-47 (1989), as *reprinted in* 1990 U.S.C.C.A.N. 3385, 3729. In fact, the primary

purpose of the Title V program is to reduce violations of the Clean Air Act and improve

enforcement of applicable air pollution limits. *N.Y. Pub. Interest Research Group v.*

*Whitman*, 321 F.3d 316, 320 (2nd Cir. 2003) (hereinafter "*NYPIRG*").

Pursuant to the Clean Air Act, the Administrator can either issue Title V permits

or approve a state program whereby each individual state issues Title V permits

pursuant to its Administrator-approved program. 42 U.S.C. § 7661a(d); 40 C.F.R. pt. 70.

However, even when states are authorized to administer the Title V operating permit

program, the Administrator still maintains significant federal oversight. For example,

the state permitting agency must forward a copy of each permit application, every

proposed permit, and every final permit to the Administrator. 40 C.F.R. § 70.8(a). The

EPA is given the opportunity to review each proposed permit and has 45 days to object

to permits that violate the Clean Air Act. 42 U.S.C. § 7661d(a)(1)(B); 40 C.F.R. § 70.8(c).

As a practical matter, the EPA currently reviews very few proposed Title V permits

submitted to it by the states. If the Administrator fails to object to a proposed permit

within this 45-day review period, the public can petition the Administrator to object to a

permit that does not comply with the Clean Air Act. 42 U.S.C. § 7661d(b)(2); *N.Y. Pub.*

*Interest Research Group v. Whitman*, 214 F. Supp. 2d 1, 1-2 (D.D.C. 2002). When the public

petitions the Administrator, the Administrator is required to "grant or deny such petition within 60 days after the petition is filed."  42 U.S.C. § 7661d(b)(2); *N.Y. Pub. Interest Research Group*, 214 F. Supp. 2d at 3.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "The mere existence of *some* alleged factual dispute between the parties will not defeat summary judgment; 'the requirement is that there be no *genuine* issue of *material* fact." *Holcomb*, 433 F.3d at 895 (emphasis original, internal quotes omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). A factual dispute will only defeat summary judgment if the fact in dispute is both "material," meaning it might affect the outcome of the case, and "genuine," meaning the party opposing summary judgment produces evidence that a reasonable jury could rely upon in returning a verdict for the nonmoving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The use of summary judgment is to be encouraged in appropriate cases. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548 (1986).

## ARGUMENT

### I. SIERRA CLUB HAS ARTICLE III STANDING TO BRING THIS CASE TO PROTECT ITS PROCEDURAL RIGHTS AND THE INTERESTS OF ITS MEMBERS.

Clean Air Act section 304(a)(2), 42 U.S.C. § 7604(a)(2), provides the Court with subject matter jurisdiction and waives the United States' sovereign immunity for suits

to compel the EPA Administrator to perform any act or duty under the Clean Air Act that is not discretionary. 42 U.S.C. § 7604(a)(2); *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 63 (D.D.C. 2004) (holding that § 7604(a)(2) "provides the district court with limited but exclusive jurisdiction to order the Administrator to perform nondiscretionary duties."); *N.Y. Pub. Interest Research Group*, 214 F. Supp. 2d at 2 ("The CAA allows any person to bring a 'citizen suit' 'against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator…'") (citing 42 U.S.C. § 7661d(b)(2)). Therefore, the Clean Air Act grants the Court jurisdiction to the greatest extent provided under Article III of the Constitution. *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC*, 354 F. Supp. 2d 697, 700 (E.D. La. 2005) (holding that the citizen suit provision of the Clean Air Act "extends to the outer boundaries of the 'case or controversy' requirement of Article III of the Constitution.")

Under Article III, an association like Sierra Club "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693 (2000). Sierra Club's members, in turn, have standing in their own right under Article III if they have (1) "suffered an 'injury in

fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180-81.  The Supreme Court has clearly established that "environmental plaintiffs adequately allege 'injury in fact' when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S. Ct. 1361 (1972)).  Adverse health and economic effects are also adequate injuries in fact.  *Id* at 181.

In cases where the injury stems from a procedural defect by an agency, such as the Administrator's failure to respond to Sierra Club's petition in this case, the plaintiff need only demonstrate that the procedure protects the plaintiff's interests. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8, 112 S.Ct. 2130 (1992).  Where Congress has provided a procedure—such as the ability for Sierra Club to petition the Administrator to object to a deficient Title V permit and receive a decision within 60 days— Congress has already linked the procedure with the goal of the Clean Air Act to protect air quality for the public, including Sierra Club's members.

A. **Sierra Club's Members' Interests in Breathing Clean Air Are Impaired by the Administrator's Unlawful Refusal to Respond to Sierra Club's Petition.**

A showing of actual or potential harm to health, aesthetic, or recreational interests due to environmental pollution satisfies the injury-in-fact prong of the standing test. *Morton*, 405 U.S. at 734 (allegations of adverse effects to "scenery, natural and historic objects and wildlife" constitute cognizable injury). Neither the magnitude of the injury nor the nature of the injury is important in the determination of standing; an "identifiable trifle" is sufficient. *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996).

Here, Sierra Club's members' reasonable concern about the polluted emissions from the Weston plant that could be harmful to those members is sufficient to establish the requisite injury-in-fact. *Laidlaw*, 528 U.S. at 181-85; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000). Sierra Club members live, work and recreate around the Weston plant. (Pl. Prop. Facts ¶¶ 8, 17.) The Weston plant emits many pollutants that are known to be harmful to humans, including the Sierra Club members who are exposed to them. (Pl. Prop. Fact ¶ 7.) The threatened injury to these Sierra Club members, due to the unlawful pollution emissions from Weston, is sufficient to provide Sierra Club with standing to compel the Administrator to respond to Sierra Club's petition that seeks to lower the applicable permit limits for Weston and, thereby, decrease its members' exposure to

harmful air pollution.[1]  *See Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006)

(holding that Sierra Club has standing to challenge procedural omissions when

granting a Title V air permit where the omissions "could have led to improvements in

the [facility's] permit, which, in turn, could have reduced the harm caused by the air

pollution emitted from the… plant").  The Administrator's response will also allay

some of the Sierra Club members' reasonable fears that the Weston permit is unlawful

and exposes them to illegal amounts of pollution, causing undue health risk.  (Pl.

Prop. Fact ¶¶ 20, 23); *NYPIRG*, 321 F.3d at 325-26 (holding that an environmental

group's "members' allegations about health effects of air pollution and of uncertainty

as to whether EPA's actions expose them to excess air pollution are sufficient to

establish injury-in-fact…").

### B.   Sierra Club's Injury Due to the Administrator's Failure to Respond to Its Petition Is Remedied by An Order From This Court Requiring the Administrator to Respond.

An organization seeking injunctive relief satisfies the requirement of

redressability by alleging a continuing violation of a legal requirement that can be

---

[1] "The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements."  *Ecological Rights Found.*, 230 F.3d 1141, 1151, (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000)).  It is "not necessary for a plaintiff challenging violations of rules designed to reduce the *risk* of pollution to show the presence of *actual* pollution in order to obtain standing." *Id.* at 1152 n.12 (emphasis in original).  *See also Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996); *Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3rd Cir. 1990) .

corrected by an injunction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108, 118 S. Ct. 1003 (1998). That is exactly what Sierra Club is alleging here: that the Administrator will continue to violate the requirement that he respond to Sierra Club's petition until ordered to do so by this Court. 42 U.S.C. § 7661d(b)(2). That is all that Sierra Club is required to show.

Moreover, Sierra Club's procedural right to obtain an Administrator decision on its petition within 60 days is a procedural injury that is sufficiently connected to its members' exposure to air pollution and therefore satisfies the redressability requirement.

> Procedural rights are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result.

*Nat'l Parks Conservation Assoc. v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (internal cites and quotations omitted). Sierra Club is only required to show that there is "[a] significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Id.* at 7 (*quoting Utah v. Evans*, 536 U.S. 452, 464, 122 S. Ct. 2191 (2002)). Here, a response by the Administrator to Sierra Club's petition,

objecting to the Weston permit, requires the Wisconsin DNR to change the permit.  42

U.S.C. § 7661d(b)(3).  If the Wisconsin DNR fails to do so, the Administrator is

required to issue a corrected permit or deny the permit for Weston.  42 U.S.C. §

7661d(c).  Because the procedure involved is connected to an improved air permit for

the Weston plant, which will protect Sierra Club members from illegal air pollution

emissions and an inadequately monitored facility, the process satisfies the test for

redressability.  *Sierra Club*, 436 F.3d at 1279 (holding that an objection by the

Administration in response to a petition by Sierra Club could lead to improvements in

the air permit, satisfying the redressability requirement).

C.    **The Interests At Stake Go To The Core Of Sierra Club's Mission.**

Sierra Club's mission is to advocate for a cleaner environment on behalf of its

members, and to use legal procedures to advocate for lower pollution limits.  (Pl.

Prop. Fact ¶¶ 3-4.)  This purpose is directly at stake in this case, where Sierra Club

seeks to compel the Administrator to respond to Sierra Club's petition seeking lower

pollution limits for the Weston plant.  *Nat'l Res. Def. Council v. Southwest Marine, Inc.*,

236 F.3d 985, 994 (9th Cir. 2000) (quoting *Laidlaw*, 528 U.S. at 181).[2]

---

[2] The claim asserted in this lawsuit, the Administrator's failure to comply with a
mandatory duty, does not require the participation of individual members of Sierra Club, or
individualized proof.  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344, 97
S.Ct. 2434 (1977).  The injunctive relief sought does not require any individual Sierra Club

II.   **THE UNDISPUTED FACTS DEMONSTRATE THAT THE ADMINISTRATOR HAS NOT COMPLIED WITH HIS MANDATORY DUTY UNDER 42 U.S.C. § 7661d(b)(2) AND SIERRA CLUB IS ENTITLED TO RELIEF AS A MATTER OF LAW**.

Congress established a regulatory framework for Title V that contains numerous mandatory deadlines. *See, e.g.*, 42 U.S.C. §§ 7661a(a), 7661b(a)-(c), 7661d(b), (c). The clear Congressional intent was to create a process for expeditious permit issuance. *See e.g.*, 42 U.S.C. § 7661a(b)(1) (requiring permitting programs to include criteria for determining completeness of an application "in a <u>timely</u> fashion"); § 7661a(b)(6) (requiring the permit program to include procedures for "<u>expeditiously</u>" determining when applications are complete and for "<u>expeditious</u>" review in court); § 7661a(b)(7) (providing an enforcement mechanism for compelling state action within the 18 month deadline in § 7661b); § 7661b(c)(requiring an application within 12 months of the source becoming subject to the Title V permit program and final action on the application within 18 months of a complete application). There is no doubt that this was Congress' intent, because Congress expressly stated that it intended Title V of the Clean Air Act to "provide an expedited process for implementing new control requirements." S. Rep. No. 101-228, at 346, as *reprinted in* 1990 U.S.C.C.A.N. 3385, 3729. Fundamental to that expedited process are "strict time limits on EPA

---

member to provide individualized proof, but it is rather "properly resolved in a group context." *Id.*

review." *Id.* at 3731. Therefore, section 7661d(b)(2) requires the Administrator to respond to a petition within 60 days.

There is no dispute that Sierra Club submitted a petition to the Administrator and that 60 days passed without a response by the Administrator. (Pl. Prop. Fact ¶¶ 14-15.) Therefore, the Administrator failed to comply with his mandatory duty set forth in 42 U.S.C. § 7661d(b)(2). There is no genuine issue as to any material fact and Sierra Club is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Holcomb*, 433 F.3d at 895.

### III.    EPA SHOULD BE ORDERED TO RESPOND TO SIERRA CLUB'S PETITION WITHIN 20 DAYS.

Sierra Club is entitled to an order compelling the Administrator to respond to Sierra Club's petition. 42 U.S.C. § 7604(a) ("district courts shall have jurisdiction… to order the Administrator to perform such act or duty."). Congress provided the EPA Administrator 60 days to respond to Sierra Club's petition. 42 U.S.C. § 7661d(b)(2). Congress found 60 days to be a sufficient period of time. While the Administrator had a clear duty to respond to Sierra Club's petition within 60 days, it has now been eight months since the petition was filed—already four times the amount of time allowed by Congress. This Court should not allow any further delay by the Administrator based on the Court's equitable powers when, as here, Congress has established deadlines. *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 53 (D.D.C. 2006) (holding that

when Congress establishes a deadline for EPA to act "that intent is of utmost importance" and a court should not "completely neutralize the mandatory nature of the statutory directive" by granting unnecessary extensions); *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 95 (D.D.C. 2001) (rejecting a remedy for EPA's failure to act "that would so completely neutralize the mandatory nature of the statutory directive."). Extending the time for the Administrator to respond "would be to grant [the Administrator] unbridled discretion to administer the Clean Air Act according to [his] own time schedule, regardless of specific congressional directions to the contrary." *New York v. Gorsuch*, 554 F. Supp. 1060, 1065 (S.D.N.Y. 1983).  The only exception, and cause for the Court to allow additional time, is when the Administrator fails to meet a deadline where he "has in good faith employed the utmost diligence in discharging his statutory responsibilities." *Sierra Club*, 444 F.Supp.2d at 52-53 (quoting *NRDC v. Train*, 510 F.2d 692, 713 (D.C.Cir. 1974)).  It is the Administrator's "heavy burden" to make this showing. *Id.* at 53.  In the present matter, the Administrator has not, and cannot, make this showing.  Therefore, 20 days—in addition to the six month extension EPA effectively granted itself by failing to respond within the 60 day statutory timeline— is more than a sufficient period of time for a response to its petition.

## Conclusion

For the foregoing reasons, there is no dispute of material fact that the Administrator failed to comply with a mandatory duty.  Therefore, Sierra Club is entitled to summary judgment on liability and to an order compelling the Administrator to respond to Sierra Club's petition within 20 days.


Dated: July 20, 2007


Respectfully submitted,

Garvey McNeil & McGillivray, S.C.


By:  s/David C. Bender

David Bender (Dist. Ct. Bar. No. WI)
634 W. Main Street, Suite 101
Madison, WI 53703
Tel. (608) 256-1003
Fax. (608) 256-0933
Bender@gmmattorneys.com


Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Civil Action No. 1:07-cv-1040-ESH |
| STEPHEN L. JOHNSON, in his | ) | |
| official capacity as Administrator, | ) | |
| United States Environmental | ) | |
| Protection Agency | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2007, I have caused a copy of the Plaintiff's Motion for Summary Judgment, together with supporting Points and Authorities, Statement of Material Facts, Proposed Order, and the Declarations of Wentzel and Nilles, on defendants by first class mail, postage prepaid:

Stephen L. Johnson, Administrator
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington D.C. 20460

Alberto Gonzales, Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Jeffrey A. Taylor

United States Attorney's Office
555 4th Street, NW
Washington, DC 20530


    __ s/ David C. Bender_____
David C. Bender
(D.D.C. Bar No.: WI)
GARVEY MCNEIL & MCGILLIVRAY, S.C.
634 W. Main Street, Suite 101
Madison, WI 53703
Tel. 608.256.1003
Fax. 608.256.0933
bender@gmmattorneys.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Civil Action No. 1:07-cv-1040-ESH |
| STEPHEN L. JOHNSON, in his | ) | |
| official capacity as Administrator, | ) | |
| United States Environmental | ) | |
| Protection Agency | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF BRUCE E. NILLES IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

I, Bruce E. Nilles, declare as follows:

1.      I make this declaration on personal knowledge of the facts contained

herein.

2.      I am a Midwest Regional Representative for the Sierra Club.

3.      As a part of my job, I am charged with overseeing and coordinating

litigation on behalf of the Sierra Club regarding coal-fired power plants.

4.      I am familiar with the Sierra Club's advocacy regarding the Wisconsin Public Service Corporation's Weston Generating Station power plant, which is operated in Marathon County, Wisconsin, (hereinafter "Weston"), including filings made with the State of Wisconsin and with the Administrator of the United States Environmental Protection Agency.

5.      The Sierra Club is an incorporated, not-for-profit corporation that has its headquarters at 85 Second Street, 2nd Floor, San Francisco, California.  Sierra Club also keeps offices and has members in the District of Columbia and Wisconsin.

6.      One of Sierra Club's purposes is to preserve, protect, and enhance the natural environment.  The mission of the Sierra Club is to influence public, private, and corporate policies through programs at the local, state, national, and international levels.  Sierra Club uses legal procedures to reduce the amount of pollution in the environment.

7.      Sierra Club has over 800,000 members nationwide, including over 10,000 in the State of Wisconsin.

8.      The Defendant, Stephen Johnson, is the Administrator of the United States Environmental Protection Agency ("EPA").

9.      This case involves Defendant Johnson's affirmative duty, as the Administrator of the Environmental Protection Agency ("EPA"), to respond to a petition filed by the Sierra Club under the Clean Air Act ("Petition").  The Petition seeks the Administrator's objection to a Clean Air Act Title V operating permit for the Weston

power plant, which will result in lesser amounts of air pollution emitted from the plant
and increased monitoring and reporting of pollution from the plant.

10.     The EPA, including Administrator Johnson's office, is located in the
District of Columbia.

**Harm to Sierra Club**

11.     Sierra Club members live, work, and recreate around the Weston power
plant. These members breathe, use, and enjoy the ambient air around the area of the
plant. The Weston plant emits many different harmful pollutants, including sulfur
oxides, nitrogen oxides, fine particulate matter, carbon monoxide, ozone precursors,
mercury, beryllium, hydrogen chlorides, sulfuric acid, and many others. According to
Defendant EPA, these pollutants are known to be harmful to humans. For example,
Defendant EPA states that "Epidemiological studies have shown statistically significant
correlations between elevated PM2.5 levels and premature mortality. Other important
effects associated with PM2.5 exposure include aggravation of respiratory and
cardiovascular disease (as indicated by increased hospital admissions, emergency room
visits, absences from school or work, and restricted activity days), changes in lung
function and increased respiratory symptoms, as well as new evidence for more subtle
indicators of cardiovascular health. Individuals particularly sensitive to PM2.5 exposure
include older adults, people with heart and lung disease, and children." 72 Fed. Reg.
20,586-87 (April 25, 2007). Additionally, according to Defendant EPA, some of these
pollutants, such as fine particulate matter, have no safe level of exposure and the harm
to human health increases proportional to the increase in exposure to the pollutants.

12.    The health of Sierra Club members, as well as their aesthetic interests and interests in health ecosystems, are and will continue to be impaired by the air pollution emitted from the Weston plant.  The Administrator's failure to respond to Sierra Club's Petition at issue in this case allows the Weston plant to emit more pollution than if the Administrator responded; Sierra Club's members are directly harmed by the Administrator's delay in responding to the Petition because they are subjected to more pollution.

13.    Sierra Club is also harmed by not having access to pollution monitoring, recordkeeping, and reporting by the Weston plant that will be required when the Administrator responds to Sierra Club's Petition.

14.    Sierra Club regularly reviews monitoring, recordkeeping, and reporting from power plants, including the Weston plant, and specifically plans to review the monitoring, recordkeeping, and reporting for the Weston power plant once the Administrator grant the Petition.

15.    Sierra Club's members also fear that the Administrator's failure to respond to Sierra Club's petition alleging violations of the Clean Air Act results in a deficient permit, illegal amounts of air pollution, and uncertainty of the health impacts to these members.  Unless the Administrator responds to the petition, Sierra Club members will not know whether the Weston facility is in compliance with applicable requirements or is emitting pollutants in excess of legal levels.

16.     Sierra Club and its members do not have access to all required monitoring, recordkeeping and reporting that will be required once the Administrator grants the Petition.

17.     The Sierra Club is also being harmed by the Administrator's failure to respond to Sierra Club's Petition because the failure to respond prohibits Sierra Club from exercising its procedural rights under the Clean Air Act.  For example, Sierra Club and its members have the right to petition for judicial review of the Administrator's final decision and have the right to enforcement of the final permit terms once issued.

18.     Sierra Club has a statutory right to seek judicial review of any adverse decision in the Administrator's response to Sierra Club's Petition.  However, judicial review cannot occur until the Administrator responds to the Petition.

19.     Additionally, when the Administrator grants Sierra Club's Petition, the State of Wisconsin will be required to revise the Weston air pollution permit.

20.     Sierra Club has participated in numerous air pollution permitting proceedings in Wisconsin, including the proceedings leading to the issuance of a proposed permit for the Weston plant.

21.     Sierra Club intends to participate in the additional proceedings on the Weston Title V permit once the Administrator acts on Sierra Club's petition and objects to unlawful provisions in the proposed permit.  However, because the Administrator has not responded to Sierra Club's Petition within the mandatory time provided under the Clean Air Act, Sierra Club is prohibited from such further participation before the state permitting agency.

22.    The Administrator's failure to respond to the Petition negatively affects

Sierra Club's procedural rights under the CAA.

**Notice**

23.    Sierra Club gave notice of its intent to sue the Administrator, pursuant to

and in compliance with the requirements in CAA § 304(b)(2), 42 U.S.C. § 7604(b)(2), and

40 C.F.R. Part 54.

24.    Sierra Club sent a notice of its intent to file this action through an April 4,

2007, Notice of Intent to Sue.

25.    A true and accurate copy of the Sierra Club's Notice of Intent to Sue is

attached hereto as Exhibit 1.

26.    The Notice of Intent was sent, via certified mail, to the following

recipients:

> The Honorable Stephen L. Johnson, Administrator
> United States Environmental Protection Agency
> Ariel Rios Building
> 1200 Pennsylvania Avenue, N.W.
> Washington D.C. 20460
>
> Mary Gade
> Regional Administrator
> US EPA Region 5
> 77 W. Jackson Blvd.
> Chicago, IL 60604
>
> Governor James Doyle
> Office of the Governor
> 115 East State Capitol
> Madison, WI 53702
>
> P. Scott Hassett
> Secretary, Wisconsin DNR

101 S. Webster St.
Madison, WI 53707

Owner or Managing Agent
Weston Generating Station
2501 Morrison Avenue
Rothschild, WI 54474

Wisconsin Public Service Corporation
700 N. Adams St.
P.O. Box 19001
Green Bay, WI 54307-9001

Barth J. Wolf, Registered Agent
Wisconsin Public Service Corporation
700 N. Adams St.
P.O. Box 19001
Green Bay, WI 54307-9001

27.    More than 60 days have passed between the date that Sierra Club

provided its Notice of Intent to File Suit to the Administrator and others and the filing

of the Complaint in this action.

**Administrator Johnson's Failure to Respond to Sierra Club's Petition**

28.    On July 17, 2006, Sierra Club submitted public comments on a draft Title

V operating permit for the Weston power plant, to the Wisconsin Department of

Natural Resources ("DNR").

29.    DNR submitted the proposed Title V operating permit for the Weston

plant to EPA on October 3, 2006 without modifying the permit to satisfy the problems

identified in Sierra Club's comments on the draft.  A true and correct copy of the DNR's

permit tracking system database page, showing that the permit was proposed to EPA

on October 3, 2006, is attached as Exhibit 2.  This commenced the 45-day EPA review

period pursuant to CAA § 505(b)(1), 42 U.S.C. § 7661d(b)(1).

     30.     Sierra Club inquired and determined that the EPA did not object to the

proposed permit for the Weston plant within 45 days after Oct. 3, 2006..

     31.     On November 20, 2006, Sierra Club petitioned the Administrator,

pursuant to CAA § 505(b)(2), 42 U.S.C. § 7661d(b)(2). and 40 C.F.R.§ 70.8(d) to object to

a proposed Operating Permit for the Weston power plant.

     32.     A true and accurate copy of Sierra Club's Petition is attached hereto as

Exhibit 3.

     33.     DNR issued the final Title V operating permit for the Weston plant on

March 30, 2007.

     34.     More than 60 days has passed since the Petition was filed with the

Administrator.

     35.     The Administrator has not granted or denied the Petition.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.


                        _Bruce E. Nilles___ _____
                        Bruce E. Nilles

Dated: July 20, 2007

# GARVEY McNEIL & McGILLIVRAY, S.C.

### ATTORNEYS AT LAW

Edward R. Garvey

Kathleen G. McNeil

Pamela R. McGillivray

Christa O. Westerberg

David C. Bender

Carlos A. Pabellon

Of Counsel:

Peter E. McKeever

Thomas G. Halloran

April 4, 2007

By Certified Mail- Return Receipt Requested

The Honorable Stephen L. Johnson, Administrator
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington D.C. 20460

> Re:    **Notice of Intent to Sue Pursuant to §304(b)(2) of the Clean Air Act for Failure to Grant or Deny Petition Filed Pursuant to §505(b)(2)**

Dear Administrator Johnson:

I represent the Sierra Club, a national organization working to protect the Nation's clean air and clean water, and our natural heritage.  The Sierra Club has over 800,000 members nationwide, including more than 13,000 members in Wisconsin.

This letter constitutes formal notice pursuant Clean Air Act 304(b)(2), 42 U.S.C. § 7604(b)(2) and 40 C.F.R. Part 54 that Sierra Club intends to file a citizen suit pursuant to Clean Air Act 304(a)(2), 42 U.S.C. § 7604(a)(2).   The Clean Air Act permits a citizen action "against the Administrator where there is alleged a

Exhibit 1

failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."  42 U.S.C. § 7604(b)(2).

On November 21, 2006, Sierra Club petitioned the U.S. EPA Administrator, pursuant to Clean Air Act § 505(b)(2) and 40 C.F.R. § 70.8(d), to object to the Proposed Title V Operating Permit for the Weston Generating Station in Marathon County, Wisconsin (Source I.D. 737009020; Permit 737009020-P02).  Sierra Club provided a copy of the petition to the Wisconsin Department of Natural Resources, the permitting authority, and to the applicant. Sierra Club's petition raised objections to the Title V permit that were, to the extent practical, raised with reasonable specificity during the public comment period.  A copy of the petition is attached hereto as Exhibit A.  U.S. EPA received the Sierra Club's petition on November 24, 2006, at 6:54 a.m.

According to Clean Air Act Section 505(b)(2), 42 U.S.C. 7661d(b)(2), "[t]he Administrator shall grant or deny such petition within 60 days after the petition is filed."  More than 60 days have passed and, to date, the Administrator has not responded to Sierra Club's petition identified above.  Sierra Club  hereby gives notice of its intent to file a citizen suit based upon the Administrator's failure to perform a non-discretionary duty, to wit, failing to grant or deny Sierra Club's petition within 60 days as required by 42 U.S.C. § 7661d(b)(2).

Pursuant to the requirement of 40 C.F.R. § 54.3, the persons giving notice

are:

> Sierra Club
> > John Muir Chapter Office at:
> > > 222 S Hamilton, #1
> > > Madison, WI 53703
> > > Phone: (608) 256-0565
>
> > Midwest Regional Office at
> > > 122 W. Wisconsin Ave., Suite 830
> > > Madison, WI 53703
> > > Phone: (608) 257-4994
>
> > National Headquarters at:
> > > 85 Second Street, 2nd Floor
> > > San Francisco, CA 94105
> > > Phone: (415) 977-5500

The EPA's regulations require this information.  However, I request that

you direct all correspondence to me, as counsel for these organizations.


> Sincerely,
> GARVEY MCNEIL & MCGILLIVRAY, S.C.
>
> David C. Bender
> Counsel for Sierra Club

See service list, next page:

Mary Gade
Regional Administrator
US EPA Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

Governor James Doyle
Office of the Governor
115 East State Capitol
Madison, WI 53702

P. Scott Hassett
Secretary, Wisconsin DNR
101 S. Webster St.
Madison, WI 53707

Owner or Managing Agent
Weston Generating Station
2501 Morrison Avenue
Rothschild, WI 54474

Wisconsin Public Service Corporation
700 N. Adams St.
P.O. Box 19001
Green Bay, WI 54307-9001

Barth J. Wolf, Registered Agent
Wisconsin Public Service Corporation
700 N. Adams St.
P.O. Box 19001
Green Bay, WI 54307-9001



### Facility Permit Search

## Facility Permit Contacts and Key Events     Help...

**New Search**   **Back to Intro Page**

| Facility and Permit Information | |
| --- | --- |
| FID: | 737009020 |
| Facility Name: | Wisconsin Public Service Corporation - Weston Plant |
| County: | Marathon |
| Facility Address: | Old Highway 51 - Weston, Rothschild |
| Responsible Official: | Mr. David Harpole, Vice President-Energy Supply |
| Responsible Official Phone #: | 920-433-1264 |
| Facility Type: | Title-V |
| Permit No: | 737009020-P02 |
| Permit Type: | Revision of a Federal Title V permit |
| Permit Inactive Since: | |
| Permit Documents: | **Available Here** |

| DNR Contact | Name | Email |
| --- | --- | --- |
| Review Engineer | Steven Dunn | **Steven.Dunn@wisconsin.gov** |
| Compliance Engineer | Rhonda O'Leary | **Rhonda.O'Leary@wisconsin.gov** |
| Supervisor | Joseph Ancel | **Joe.Ancel@wisconsin.gov** |

| Key Event Name | Event Date |
| --- | --- |
| Permit Expiration Date | 10/15/2009 |
| EPA Notified. Final Permit on the Web. | 04/23/2007 |
| Permit Authority Issues Permit | 03/30/2007 |
| Permit Proposed to EPA. | 10/03/2006 |
| WDNR Requested US EPA for a 15-day Review | 10/02/2006 |
| Permit ready to be proposed to EPA | 09/28/2006 |
| EPA Notified. Draft permit on the Web. | 06/25/2006 |
| Notice to public - Start of Public Comment Period | 06/17/2006 |
| Permit draft - Supervisor Signs Public Notice | 06/16/2006 |
| Permit Application Complete | 05/08/2006 |
| Permit Application Received | 04/18/2006 |

Exhibit 2

**BEFORE THE ADMINISTRATOR**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

In the Matter of an Air Pollution Control
Operating Permit for Wisconsin Public Service
Corporation's Weston Generation Station in
Marathon County, Wisconsin.

Source I.D. 737009020

Permit 737009020-P02

Proposed by the Wisconsin Department of
Natural Resources on September 28, 2006.

**PETITION REQUESTING THAT THE ADMINISTRATOR OBJECT TO ISSUANCE
OF THE PROPOSED REVISED TITLE V OPERATING PERMIT FOR THE WESTON
GENERATING STATION IN ROTHCHILD, WISCONSIN**

GARVEY MCNEIL & MCGILLIVRAY, SC
David C. Bender
(Wis. Bar No. 1046102)
634 W. Main St., Ste 101
Madison, WI 53703
Phone: (608) 256-1003
Fax: (608) 256-0933
bender@gmmattorneys.com


SIERRA CLUB
Bruce Nilles
(Wis. Bar No. 1026351)
214 N. Henry Street, #203
Madison, WI 53703-2200
Phone: (608) 257-4994
Fax: (608) 257-3513
bruce.nilles@sierraclub.org

Date: November 20, 2006

Exhibit 3

Pursuant to Clean Air Act § 505(b)(2) and 40 CFR § 70.8(d), the Sierra Club hereby petitions the Administrator ("the Administrator") of the United States Environmental Protection Agency ("U.S. EPA") to object to proposed revised Title V Operating Permit for the Weston Generating Station in Rothschild, Wisconsin, Permit 737009020-P02 ("Permit"). The Permit was proposed to U.S. EPA by the Wisconsin Department of Natural Resources ("DNR") more than 45 days ago.  A copy of the Permit is attached as Exhibit A.  Sierra Club provided comments to the DNR on the draft permit.  A true and accurate copy of Sierra Club's comments is attached at Exhibit B.  DNR responded to Sierra Club's comments through a memorandum, a copy of which is attached as Exhibit C.

This petition is filed within sixty days following the end of U.S. EPA's 45-day review period as required by Clean Air Act ("CAA") § 505(b)(2). The Administrator must grant or deny this petition within sixty days after it is filed.  If the Administrator determines that the Permit does not comply with the requirements of the CAA, or fails to include any "applicable requirement," he must object to issuance of the permit.  42 U.S.C. § 7661b(b); 40 C.F.R. § 70.8(c)(1) ("The [U.S. EPA] Administrator will object to the issuance of any permit determined by the Administrator not to be in compliance with applicable requirements or requirements of this part.").  "Applicable requirements" include, *inter alia*, any provision of the Wisconsin State Implementation Plan ("SIP"), including Prevention of Significant Deterioration ("PSD") requirements, any term or condition of any preconstruction permit, any standard or requirement under Clean Air Act sections 111, 112, 114(a)(3), or 504, acid rain program requirements.  40 C.F.R. § 70.2.

Notably, "applicable requirements" include any requirement to obtain a preconstruction permit and comply with New Source Review regulations. *In re Monroe Electric Generating Plant*, Petition No. 6-99-2 at p. 2 (EPA Adm'r 1999).

1. **The Permit Illegally Limits Evidence That Can Be Used By Citizens To Demonstrate Noncompliance.**

In response to comments by the Sierra Club, DNR revised the preamble to the permit to state: "Not withstanding the compliance determination methods which the owner or operator of a source is authorized to use under ch. NR 439, Wis. Admin. Code, the department may use any relevant information or appropriate method to determine a source's compliance with applicable emission limitations." Ex. A p. 4; Ex. C pp. 2-3 (emphasis added). This is an improvement on the draft permit. However, it fails to comply with the credible evidence rule because it purports to reserve the right to use any credible evidence to only the "department," meaning the DNR. By omission of U.S. EPA and citizens, this provision could be interpreted as prohibiting the use of credible evidence by EPA or citizens. The permit cannot expressly prevent the use of credible evidence and should not do so implicitly either.

The U.S. EPA and citizen suit litigants have the authority to bring enforcement actions "on the basis *of any information available* to the Administrator." 42 U.S.C. § 7413 (emphasis added); *see also* 42 U.S.C. § 7604; *Sierra Club v. Pub. Serv. Co. of Colorado, Inc.*, 894 F.Supp. 1455 (D.Colo. 1995) (The Clean Air Act does not limit the evidence that citizen suit plaintiffs can use to demonstrate noncompliance); *Credible Evidence Revisions*, 62 Fed. Reg. 8314 (Feb. 24, 1997); U.S. EPA Region 9 *Title V Permit Review Guidelines*,

Sept. 9 1999, p. III-46. By reserving the right to use any relevant information to only enforcement actions brought by the DNR, the Permit tacitly precludes this right for U.S. EPA and citizens. The credible evidence rule does not allow the DNR to limit EPA or citizens' ability to use any credible evidence. Therefore, the Administrator must object to the permit and require the DNR to amend the preamble to allow the use of any credible evidence by U.S. EPA and citizen suit plaintiffs, in addition to DNR.

   2.  **The Permit Illegally Omits Operating Limitations Applicable to Unit 3**

   The Permit describes Unit 3 as "a tangentially fired boiler installed in December 1981." Ex. A p. 20. The Permit also notes that the maximum heat input for Unit 3 is 3906 MMBtu/hr. This maximum heat input fails to account for the fact that Unit 3 is subject to a lower limit on heat input. Additionally, the Permit lacks enforceable operating limits applicable to Unit 3.

   As noted above, every Title V permit must include all "applicable requirements," which includes requirements from preconstruction permits. 40 C.F.R. § 70.2. U.S. EPA issued a preconstruction permit for Unit 3 in 1977. Ex. D. That permit authorized Wisconsin Public Service Corporation ("WPSC") "to construct one 321 MW electrical generating unit…" Ex. D p. 4 (WP2-7-00313). Moreover, the permit required WPSC to construct and operate Unit 3 "consistent with the materials and data included in the application filed by the Corporation." The Wisconsin DNR also issued a preconstruction permit for Unit 3, pursuant to the Wisconsin State Implementation Plan (SIP), that requires "[t]hat the system be installed in accordance with submitted plans

and specifications…" and that "[a]ny construction or operation of this facility which proceeds at variance with the submitted specifications or approval conditions will be regarded as a violation of the approval…" Ex. F, pp. 1, 3. In short, both preconstruction permits require compliance with the specifications provided in the application materials. Such specifications include: (1) a maximum 3,423.48 MMBtu/hour heat input; (2) a maximum 2,350,000 pounds of steam per hour; (3) a maximum 321 megawatts per hour of generation; and (4) a maximum 191 tons of bituminous coal burned per hour. *See* Application to Construct Weston Unit 3, p. WP2-7-00243-44, WP2-7-00246 (attached hereto as Exhibit E, pp. 10-11, 13) (stating that the unit size is 3423.48 $10^6$BTU/hour, will provide 321.9 MW,[1] and will use a maximum 191 tons of bituminous coal per hour); Notice of Intent to Construct Unit 3, p. WP2-7-00267, 00269 (attached hereto as Ex. G, p. 5) (stating that the unit size will be 321,800 kW and produce 2,350,000 lb/hour of steam). Even if the permit were silent on the issue, these specifications from the permit application constitute applicable operating limits for Unit 3. 40 C.F.R. § 70.2. The Clean Air Act requires that a PSD applicant construct and operate the source consistent with and according to the specifications provided in its permit application. 40 C.F.R. § 52.21(r); Notice of Violation Issued to East Kentucky Power Cooperative at ¶ 6 (January 24, 2003) (attached as Exhibit H); *see also* Letter from Beverly H. Banister, Directors Air, Pesticides and Toxics Management Division, U.S. EPA Region IV, to John S. Lyons, Kentucky Department for Environmental Protection (February 18, 2006)

---

[1] The application states 321,900 Megawatts, which clearly refers to 321,900 kW, or 321.9 MW. *See* Ex. G p. 2 (unit 3 will produce 321,800 kW).

(objecting to a Title V permit for the Tennessee Valley Authority's Plant Paradise because the permit did not include applicable maximum heat input limits) (attached hereto as Exhibit K). However, the permits are not silent. To the contrary, they expressly provide that departure from the application specifications for Unit 3 constitute violations of the permits. Ex. D pp. 1, 4; Ex. F pp. 1, 3. Therefore, the unit specifications in the application are applicable requirements that must be included in the Title V permit. 40 C.F.R. § 70.2 (applicable requirements include "[a]ny standard or other requirement provided for in [the SIP] or promulgated by EPA... [and] [a]ny term or condition of any preconstruction permits issued pursuant to [the PSD program]..."); 40 C.F.R. § 52.21(r) (requiring a new or modified major source to construct and operate consistent with the specifications in its permit application); Wis. Stat. § 285.64(1); Wis. Admin. Code § NR 400.02(26).

> [A PSD permit issued by EPA], in effect, limits increases beyond certain parameters (e.g., heat input, steam production, megawatt production) proposed by [the applicant] in its PSD permit application. The permit clearly states that the permit is issued for the project "as proposed" by the company. It also states that operation of the source not in accordance with what was proposed by the company and what was reviewed/approved by EPA would be subject to enforcement action. (NOTE: This mentioned text is probably contained in each PSD permit issued by EPA/Region VII). As such, the permit prohibits increases of production rates that were proposed and reviewed/approved.

Memorandum Re: PSD-Sunflower Electric, Holcomb, KS (from files of U.S. EPA Region VII Air Permitting and Compliance Branch) (attached hereto as Exhibit L).

The operating limits applicable to Unit 3 are not mere formalities. Limits on heat rate and production rate are important because an increase in the heat input results in an increase in allowable emissions. Unit 3 was permitted assuming a maximum hourly emission rate, which was determined by multiplying the maximum heat rate (3423.8 MMBtu/hour) by permit limits expressed as pounds per MMBtu heat input. If Unit 3 operates at a higher heat rate than the maximum specified in WPSC's application (3423.8 MMBtu/hour), the preconstruction analysis is undermined.

> A boiler's maximum heat input rate is thus a measure of its size or capacity. Clearly, then, a coal-fired boiler's heat input rate is directly related to the amount of pollution it can emit. Congress' understanding of this fact in the context of the Clean Air Act is evidenced by the fact that heat input is used to determine which sources are potentially subject to the statutory PSD program. See 42 U.S.C. § 7479(1) (defining "fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input" as a type of stationary source). As an example of the direct relationship between heat input capacity an the amount of pollution, [a boiler] permitted to burn coal containing an specific amount of sulfur dioxide (SO2), as measured in pounds of SO2 per mmBtu. For any given coal SO2 content (i.e., pounds of SO2 per mmBtu), there is a direct and linear relationship between heat input and SO2 emissions. By increasing its heat input capacity, [the boiler] increases its capacity to generate steam and SO2…
>
> The rated heat input capacity of a boiler is not a meaningless number. Rather, it is directly related to the capacity of the boiler to emit pollution. In the absence of a boiler heat input capacity in the description, [the boiler] could be a unit of any size, which would translate into widely ranging impacts on the environment. Common sense thus dictates that a permit concerned with emissions must limit the heat input of the boiler. Otherwise, the regulated unit is not really limited in its capacity to pollute… The greater the capacity of the boiler, the more tons of SO2 that will be emitted into the

> atmosphere. Thus, heat input capacity plays a very real role
> in effectively limiting a source's capacity to emit pollution.

United State's Memorandum in Support of its Sixth Motion for Summary Judgment,

*United States v. East Kentucky Power Cooperative, Inc.*, Case No. 04-34 KSF (E.D. Ky), pp.

16-17, 20-21 (attached as Exhibit I, hereto).

In the *East Kentucky Power Cooperative* enforcement case brought by EPA, the

company had applied for a PSD permit from EPA. Ex. J, p. 34. The company's permit

application indicated that the boiler had a heat rate capacity of 4,850 MMBtu/hour. *Id.*

The air quality modeling and compliance determinations performed by EPA and the

state permitting authority were based on the heat rate input included in the permit

application. *Id.* at 36. EPA concluded that the heat rate from the application constitutes

an operational limit.

> By increasing the heat input over the levels identified in its
> applications, [the company] has fundamentally changed the
> assumptions upon which approval to construct the unit was
> based. If air quality modeling were to be done using a
> higher heat input capacity and the same coal sulfur content
> that was identified in [the company's] permit application…
> the unit would have been modeled at a higher emissions rate
> because increasing the heat input rate is directly
> proportional to the amount of emissions from a unit.

*Id.* at 36-37. The same is true for Weston Unit 3. Weston Unit 3 sought and obtained a

PSD permit from U.S. EPA based on WPSC's representations that it was building a unit

capable of (1) a maximum 3,423.48 MMBtu/hour heat input; (2) a maximum 2,350,000

pounds of steam per hour; (3) a maximum 321 megawatts per hour of generation; and

(4) a maximum of 191 tons of bituminous coal burned per hour. Ex. E, pp. 10-11, 13

(stating that the unit size is 3423.48 10⁶BTU/hour, will provide 321.9 MW,[2] and will use a maximum 191 tons of bituminous coal per hour); Ex. G, p. 5 (stating that the unit size will be 321,800 kW and produce 2,350,000 lb/hour of steam). These characteristics were then used to model and determine compliance determinations when issuing the PSD permit for Unit 3.

Despite the fact that WPSC's PSD permit and DNR preconstruction permit applications for Unit 3 included unit characteristics of (1) a maximum 3,423.48 MMBtu/hour heat input; (2) a maximum 2,350,000 pounds of steam per hour; (3) a maximum 321 megawatts per hour of generation; and (4) a maximum of 191 tons of bituminous coal per hour, the Title V permit proposed by DNR fails to incorporate these specifications as enforceable operating limits. Instead, the Permit actually identifies Unit 3 as capable of 3,906 MMBtu/hour—which is higher than the 3,423.48 MMBtu/hour specification provided for in Unit 3's PSD permit application. While Sierra Club raised this comment, the DNR did not respond. EPA must object to the permit based on its failure to include applicable production limits from the PSD permit. Failure to do so results in a deficient permit that allows illegal quantities of air pollution.

---

[2] The application states 321,900 Megawatts, which clearly refers to 321,900 kW, or 321.9 MW. *See* Ex. G p. 2 (unit 3 will produce 321,800 kW).

### 3. The Permit Fails To Include A Compliance Schedule For The Plant's Continuing Violations of the Heat and Energy Limits In the PSD Permit For Unit 3.

Every Title V permit must "assure[] compliance by the source with all applicable requirements." CAA § 504(a); 40 C.F.R. § 70.1; Wis. Stat. § 285.64(1); Wis. Admin. Code § NR 407.09(4)(b). "Applicable requirements" include requirements contained in preconstruction permits. 40 C.F.R. § 70.2; Wis. Stat. § 285.64(1); Wis. Admin. Code § NR 400.02(26). If a source is not in compliance with any applicable requirement, it must disclose that fact in its Title V permit application. 42 U.S.C. § 7661b(b); 40 C.F.R. §§ 70.5(c)(4)(i), (5), (8); Wis. Admin. Code § NR 407.05(4)(h). Additionally, the source must provide a narrative description of how the source intends to come into compliance with any requirements for which it will not be in compliance when the permit is issued. 42 U.S.C. § 7661b(b); 40 C.F.R. § 70.5(c)(8)-(9); Wis. Admin. Code § NR 407.05(4)(h)2.c.

When DNR issues a permit, it must include a compliance schedule for any applicable requirements for which the source is not in compliance. 40 C.F.R. § 70.5(c)(8)(iii); Wis. Admin. Code § NR 407.05(4)(h)3.c.

> 40 C.F.R. § 70.5(c)(8)(iii)(C) and 70.6(c)(3) require that, if a facility is in violation of an applicable requirement and it will not be in compliance at the time of permit issuance, its permit must include a compliance schedule that meets certain criteria. For sources that are not in compliance with applicable requirements at the time of permit issuance, compliance schedules must include 'a schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance.' 40 C.F.R. § 705(c)(8)(iii)(C).

*In the Matter of Onyx Environmental Services*, Order Responding to Petitioners' Request That the Administrator Object to Issuance of a State Operating Permit, pp. 6-7 (Adm'r Feb. 1, 2006) (hereinafter "Onyx").

Unit 3 at the Weston Generating Station has been in continuous noncompliance with its PSD permit. As set forth above, the SIP-based preconstruction permit and the EPA-issued PSD permit for Unit 3 require compliance with the following specifications from the permit application for Unit 3: maximum 3,423.48 MMBtu/hour heat input; maximum 2,350,000 pounds of steam per hour; maximum 321 MW/hour; and combustion of a maximum of 191 tons of coal per hour. *See* sec. 2, *supra*. However, capacity tests run on Unit 3 in 1985 and 2000 indicate maximum steam production of 2,418,000 and 2,429,500 pounds per hour, respectively and well over 321 MW during nearly all periods of operation. *See* WPSC Units Steam Flow Rates at WP2-4-00081 (attached as Exhibit M); Unit 3 Capacity Rates, WP2-4-00143 (attached as Exhibit N). In fact, in WPSC's 1985 Life Extension Program document, WPSC notes that "Weston Unit #3 has recently been rated 21 MW higher than previously rated." *See* WPSC Life Extension Program at WP2-6-00987 (attached hereto as Exhibit O). This continual operation above the operational limits applicable to Unit 3 constitute violations that must be addressed in the Title V permit. 42 U.S.C. § 7661b(b); 40 C.F.R. §§ 70.5(c)(4)(i), (5), (8)-(9); Wis. Admin. Code § NR 407.05(4)(h). EPA addressed similar situation regarding the East Kentucky Coop. Spurlock facility in Kentucky:

> [T]he PSD regulations specifically provide that operating a
> source... in a manner that is inconsistent with a prior permit

application is considered by definition to be a 'change in the method of operation.'

… By definition, then, the regulations define a 'change in the method of operation' as including an increase in the hours of operation or in the production rates that would be prohibited by 40 C.F.R. § 52.21 or 401 Ky. Admin. Reg. 50:035. The applicable regulations set forth at 40 C.F.R. § 52.21, in turn, prohibit the owner or operator of a source that originally obtained PSD approval under EPA's regulations from operating that source 'not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct.' 40 C.F.R. § 52.21(r)(1)…

Thus, under the plain language of the applicable production rate/hours of operation exclusion set forth at 401 Ky. Admin. Reg. 51.017 Section 1(2)(b)[3], operation not in accordance with a PSD application or authority to construct (as required by 40 C.F.R. § 52.21(r)(1)) or operation not in accordance with a state operating permit application or permit… constitutes, by definition, a change in the method of operation of a source. In other words, the plain language of the exclusion clearly defines operation not in accordance with a previously submitted PSD application or PSD permit, or state operating permit application or permit, as a regulatory 'change in the method of operation.'

Plaintiff United States' Memorandum in Support of Its Fourth Motion for Summary Judgment, U.S. v. East Kentucky Power Cooperative, Inc., Case No. 04-34 KSF, pp. 32-33 (E.D. Ky., filed January 17, 2006) (attached hereto as Exhibit J). Sierra Club's comments to DNR addressed the fact that Unit 3 was operating in excess of its PSD permit specifications, without such violations being addressed in the Title V permit. Ex. B pp. 23-24. However, the DNR did not include a compliance schedule to bring Unit 3 into compliance. The Administrator must object. A failure to object will result in continuing

---

[3] Compare to Wis. Admin. Code § NR 405.02(21)(b).

operation of Unit 3 in violation of operation limits and, consequently, illegal amounts of

air pollution affecting Sierra Club's members.

### 4. The Permit Contains Insufficient Monitoring for Particulate Matter Emissions From Units 1, 2, and 3.

Sierra Club's comments to the DNR requested sufficient monitoring for Units 1, 2
and 3. Ex. B pp. 2-3. Specifically, Sierra Club stated that:

> The PM limits for Boilers 1 and 2 must include sufficient
> monitoring to assure continuous compliance. The Draft
> Permit requires monitoring of electrostatic precipitator
> ("ESP") parameters and requires WPS to "define normal
> performance ranges for the parameters… in its Malfunction,
> Prevention and Abatement Plan." This is insufficient for
> two reasons:
>
>> a. The ESP parameters must be made enforceable, and
>> not merely "determined" by WPSC. *See* 40 C.F.R. §§
>> 70.6(a)(3)(i)(B); Wis. Admin. Code §§ NR
>> 407.09(1)(c)(1)b. (monitoring must assure compliance
>> based on sufficient data for the relevant time period); Wis.
>> Admin. Code § NR 407.09(1)(c)1.b. U.S. EPA
>> requires that the permit either: (1) establish an
>> enforceable parameter range correlated to compliance
>> with the PM limits; or (2) specify a method for
>> establishing a range and provide that such range is an
>> enforceable permit requirement. *In the Matter of
>> Midwest Generation, LLC, Waukegan Generation Station*,
>> Order Responding to Petitioner's Request That the
>> Administrator Object to Issuance of a State Operating
>> Permit at pp. 20-21 (September 22, 2005); *see also In Re
>> Port Hudson Operation Georgia Pacific*, Petition No. 6-
>> 03-01, at pages 37-40 (May 9, 2003) ("Georgia
>> Pacific"); *In Re Doe Run Company Buick Mill and Mine*,
>> Petition No. VII-1999-001, at pages 24-25 (July 31,
>> 2002) ("Doe Run"); *In the Matter of Dunkirk Power LLC*,
>> Order Objecting to Proposed Operating Permit No. II-
>> 2002-02 at 20 (Adm'r July 31, 2003) ("Once the
>> operating ranges have been established for the ESP
>> operating parameters [based on emission stack tests],

operating the ESP outside of any of these ranges would constitute a violation of the title V permit."); *In the Matter of Oxy Vinyls, LP, Louisville, Kentucky*, Objection to Proposed Part 70 Operating Permit No. 212-99-TV (Feb. 1, 2001) ("The permit must specify the parametric range or procedure used to establish that range, as well as the frequency for re-evaluating the range.").

b.  DNR is relying on the Malfunction Prevention and Abatement Plan ("MPAP") as the basis for determining adequate ESP parameter ranges, which in turn are used to demonstrate adequate ESP operation, and therefore compliance with the PM limit.   In other words, determining continuous compliance with the PM limit will depend on the MPAP.  Therefore, the MPAP must be provided <u>in the application</u>.   40 C.F.R. § 70.5(a)(2) (a complete application must contain sufficient information to determine all applicable requirements), 70.5(c).  More importantly, DNR must approve the ESP parameter range as assuring compliance, but cannot do so until it reviews the MPAP. 40 C.F.R. §§ 70.6(a)(1), 70.7(a)(iv); *Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832, 855-56 (9th Cir.2003) ("[P]rograms that are designed by regulated parties must, in every instance, be subject to meaningful review by an appropriate regulating entity to ensure that each such program [complies with the relevant statutory standard].");  *In re RockGen Energy Center*, 8 E.A.D. 536, 553-54 (EAB 1999) (remanding DNR permit requirement for a startup/shutdown plan that was not reviewed by DNR before permit issuance).  DNR cannot assume sufficient monitoring based on a parameter range that is not yet determined,  and is left to the permittee to determine at some point in the future.   Moreover, the public must be given the opportunity to review the MPAP before permit issuance to be able to provide meaningful comments on the sufficiency of the ESP parameter monitoring as the method for assuring continuous compliance.  40 C.F.R. § 70.7(h); *Waterkeeper Alliance v. EPA*, 399 F.3d 486, 503-04 (2nd Cir. 2005) (invalidating EPA

regulation that allowed nutrient management plans to be submitted after public comment and after a NPDES permit was issued); *RockGen*, 8 E.A.D. at 553-54 (remanding permit requirement for a startup/shutdown plan that was not subject to public notice and review).

The permit must establish an enforceable pressure drop range for Boiler 3. The Draft Permit requires the source to monitoring pressure drop, but does not require an enforceable range that correlates to continuous compliance with the PM limit. *Waukegan* at pp. 20-21; see also *In the Matter of Dunkirk Power LLC*, at 20; *In the Matter of Oxy Vinyls*, supra. The permit must establish an enforceable pressure drop range or provide a specific process for determining the range and make such range enforceable as part of the permit.

Ex. B pp. 2-3.

In summary, Sierra Club's comments requested sufficient parametric monitoring to satisfy the requirement in 40 C.F.R. §§ 70.6(a)(3)(i)(B) and in the SIP at Wis. Admin. Code §§ NR 407.09(1)(c)1.b. The Permit relies on electrostatic precipitator (ESP) and baghouse parameters to monitor compliance with the PM limits for Units 1, 2, and 3. Sierra Club asked that parametric ranges for the ESP and baghouse be established and made enforceable in the permit to ensure that the source is continuously complying with its permit limits. *In the Matter of Midwest Generation, LLC, Waukegan Generation Station*, at pp. 20-21; *In Re Port Hudson Operation Georgia Pacific*, pp. 37-40; *In Re Doe Run Company Buick Mill and Mine*, pp. 24-25; *In the Matter of Dunkirk Power LLC*, p. 20; *In the Matter of Oxy Vinyls, LP, Louisville, Kentucky,*. Additionally, Sierra Club requested that the parametric monitoring ranges be reviewed and approved by DNR and subject to

public notice and comment.  The applicable law and prior Administrator decisions

support both requests by Sierra Club.

DNR did not respond to the substance of Sierra Club's comments.  Instead, DNR

stated that

> The emission limitation for particulate matter has not been
> changed in this permit and neither has the compliance
> monitoring requirements cited by the commenter.  Since this
> compliance monitoring is unchanged in this permit revision
> from the original Title V permit, the Department is not
> accepting comments on this permit provision at this time.

Ex. C p. 1 ¶¶ 4 and 5.

DNR's response violates Part 70 and the Wisconsin SIP.  The DNR is required to

provide for "public comments and a hearing on the draft permit."  40 C.F.R. § 70.8(h).

This is not limited to the provisions that are revised, but to the entire permit.

Additionally, Wis. Admin. Code § NR 407.13, which is included in the Wisconsin SIP,

requires that before issuing a Title V permit, the DNR must ensure that the source—not

just the revised permit provisions-- meets <u>all</u> requirements in Wis. Stat. § 285.62.

Section 285.62, Stats., in turn, requires that the permit contain monitoring "sufficient to

yield reliable data from the relevant time period that are representative of the stationary

source's compliance with the permit."  Wis. Stat. § 285.62(7)(a), 285.63(1)(a); Wis.

Admin. Code § NR 407.09(1)(c)b.  In short, DNR is required to determine that the

permit contains sufficient monitoring to ensure continuance compliance.  DNR refused

to do so, arguing that it is not required to ensure compliance with monitoring

requirements during permit revisions.

EPA must object to the permit because it fails to include sufficient parametric

monitoring for particulate matter emissions from units 1, 2 and 3. Rather than

including enforceable parametric ranges that are demonstrated to ensure compliance

(i.e., through stack testing correlation), the permit only requires that the permittee

operate within "normal performance ranges. " Ex. A pp. 6, 14, 20. Such "ranges" are to

be determined solely by the permittee and included in a Malfunction, Prevention and

Abatement Plan sometime after the final permit is issued. *Id.* This scheme fails to

comply with the requirements of Title V because it: (1) does not make the "normal

performance ranges" enforceable; (2) does not subject the "performance ranges" to

DNR review for adequacy and accuracy; and (3) does not allow the public to review

and determine adequacy of the ranges through public notice and comment. 40 C.F.R. §

70.5(a)(2) (a complete application must contain sufficient information to determine all

applicable requirements), 70.5(c) (application cannot "omit information needed to

determine the applicability of, or impose, any applicable requirement..."); 40 C.F.R. §§

70.6(a)(1), 70.7(a)(iv) (DNR must determine that the permit requirements-- including the

"normal performance ranges" for parametric monitoring-- assure compliance with all

applicable requirements); *Environmental Defense Center, Inc. v. EPA* 344 F.3d 832, 855-56

(9th Cir.2003) (holding that permit conditions intended to ensure compliance with

regulatory standards must be reviewed by the permitting agency to determine that the

conditions do, in fact, ensure compliance); *In re RockGen Energy Center*, 8 E.A.D. 536,

553-54 (EAB 1999) (remanding a permit requirement because it was not reviewed by

DNR before permit issuance and was not subject to public notice and review); *In re Fisk*

*Generating Station* at p. 14 (requirements must be contained within the permit for the permit to be practically enforceable).  The Administrator must object to the Permit and require an enforceable parametric monitoring range, subject to DNR review and approval, and subject to public review and comment.

**5.    The Permit Fails to Require Sufficient Monitoring to Ensure Compliance With Visible Emission Limits on Sources B11, B12, and B13.**

Sierra Club commented to DNR that the monitoring for B11, B12 and B13 ensures compliance with visible emission limits is insufficient.  Ex. B pp. 5-6.  Indeed, the monitoring is nonexistent.  DNR <u>assumes compliance</u> with the particulate matter and visible emission limits for these units, based on fuel (#2 distillate and gas).  Ex. A pp. 26, 29-30, 33-34.  However, DNR concedes that a restriction on fuel type is not enough to ensure compliance.  DNR's response to comments states that "the combustion of #2 oil could possibly lead to opacity exceedances…"  Ex. C p. 1 ¶ 6.  DNR nevertheless declined to include monitoring of visible emissions based on its assumption that "the general incentive for the permittee to run these operations efficiently to lower the cost of producing power, are adequate to demonstrate compliance…"  *Id.*  This is insufficient monitoring to satisfy the requirement that the permit require monitoring sufficient to ensure continuous compliance.  40 C.F.R. § 70.6(a)(3); Wis. Admin. Code § 407.09(1)(c).  The Administrator must object.

Moreover, the Wisconsin SIP requires one of two methods for monitoring compliance with opacity limits:

1.   Method 9 in 40 CFR part 60, Appendix A, incorporated by reference in s. NR 484.04 (13); or

2. Install, calibrate, maintain and operate a continuous emission monitor that meets the applicable performance specifications in 40 CFR part 60, Appendix B or 40 CFR part 75, Appendices A to I, incorporated by reference in s. NR 484.04 (21) and (27), and follow a quality control and quality assurance plan for the monitor which has been approved by the department.

Wis. Admin. Code § NR 439.06(9)(a); 40 C.F.R. § 52.2570(c)(98)(i).  One of these two monitoring options must be used.  The Permit fails to require one of these two monitoring options for processes B11, B12 and B13.  For this reason, too, the Administrator must object.  42 U.S.C. § 7661d(b)(2) ("The Administrator shall issue an objection with such period if the petition demonstrated to the Administrator that the permit is not in compliance with [the Clean Air Act], including the requirements of the applicable implementation plan."); 40 C.F.R. § 70.2 (a SIP requirement is an "applicable requirement" under CAA Title V).

### 6. The Permit Revision Constitutes A Change In the Method of Operation Without Going Through PSD Permitting.

The Administrator must object to the Permit because it fails to comply with all applicable requirements, including PSD permitting requirements.  42 U.S.C. § 7661d(b); 40 C.F.R. § 70.8(d); *New York Public Interest Research Group v. Whitman*, 321 F.3d 316, 333 n.11 (2nd Cir. 2002); *In re Monroe Electric Generating Plant, Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2, Order Responding to Petitioner's Request that the Administrator Object to Issuance of a State Operating Permit at 2 (EPA Adm'r; available at

http://www.epa.gov/Region7/programs/artd/air/title5/t5memos/ccaw_ord.pdf).  The

Administrator must object to permits that fail to require a source to obtain necessary preconstruction permits and comply with new source review requirements.   The Administrator must object to the permit for the Weston plant because it modifies emission limits for the boilers and combustion turbines in a manner that constitutes "a change in the method of operation," but does not require that the plant obtain the necessary preconstruction permits and comply with new source review requirements. *Id.*

A.   Increases In The Carbon Monoxide Limits For Units 1 and 2

The prior Title V permit for the Weston Station limited hourly carbon monoxide ("CO") emissions to 30.80 pounds per hour for Boiler 1 and 35.90 pounds per hour for Boiler 2.  *See* Permit 737009020-P01 §§ I.A.5(a)1, I.B.5.(a)1 (attached hereto as Exhibit P). The modified permit increases the hourly emissions to 36.5 and 84 pounds per hour, respectively.  Ex. A §§ I.A.5(a), I.B.5(a).  This is a 53.8 pound-per-hour increase in allowable emissions; a 235.64 ton increase annually.  This is a significant increase pursuant to Wis. Admin. Code § NR 405.02(27)(a)1.

DNR does not disagree that the Title V permit modification substantially increases CO emission rates.  Instead, DNR contends that the changes in emission limits do not result in any "change in the method of operation" of the boilers.  Ex. C p. 2 ¶ 10. DNR misinterprets the definition of "change in the method of operation."  The boilers were previously limited in the fuel they used and their production rate due to the prior permit's CO limits.  The boilers could meet their CO limits by burning clean fuel or by

restricting their production rate. By increasing the CO limits, DNR effectively allows the units to burn dirtier fuel and increase the production rate.

Boilers 1 and 2 are wall-fired boilers capable of burning coal, natural gas, distillate and other fuels. By burning natural gas, these units can limit their CO emissions to 84 lb/$10^6$ scf. *See* U.S. EPA AP-42 Emission Factor 1.4-5, Table 1.4-1. This translates to 0.082 lb CO/MMBtu. *Id.* This means that by burning natural gas and limiting heat input to 375.6 MMBtu/hour, Unit 1 could have complied with its prior permit limit. (0.082 lb/MMBtu* 375.6 MMBtu/hour = 30.80 lb/hour). Another option was to burn coal and limiting the amount of coal burned. The emission when burning coal are 0.5 lbs of CO per ton of coal combusted. *See* U.S. EPA AP-42 Emission Factors Table 1.1-1. Unit 1 could have complied with its prior permit limit by combusting fewer than 73 tons of coal per hour. (73 tons of coal/hour* 0.5 lb CO/ton of coal = 30.80 lb CO/hour). Alternatively, Unit 1 could have achieved compliance by burning less than 6,160 gallons of fuel oil per hour. *See* AP-42 Emission Factor 1.3, Table 1.3-1(5 lb CO/ $10^3$ gallons of fuel oil * 6,160 gallons/hour = 30.80 lb CO/hour). Similarly, Unit 2 could have achieved its previous permit limit (35.90 lb CO/hour) by limiting its heat input to 437.8 MMBtu per hour when burning gas. *See* AP-42 1.4 (0.082 lb CO/MMBtu * 437.8 MMBtu/hour = 35.90 lb CO/hour). Alternatively, Unit 2 could achieve its prior 35.90 lb/hour CO limit when burning by burning less than 71.8 tons of coal or less than 7,180

gallons of fuel oil per hour.[4]  AP-42 1.1 (0.5 lb CO/ton coal * 71.8 tons/hour = 35.90 lb

CO/hour); AP-1.3 (5 lb/ $10^3$ gallons * 7,180 gallons/hour = 35.90 lb CO/hour).

Therefore, the previous permit's CO hourly emission limit for units 1 and 2 acted

as an enforceable limit on the type of fuel and production rate (heat rate) of the boilers.

The proposed Permit (737009020-P02) significantly increases the CO limit for units 1

and 2, which increases the production rate and allows a change in fuel.  Such changes

constitute a "change in the method of operation" of units 1 and 2.  Wis. Admin. Code §

NR 405.02(21).  While the term "change in the method of operation" is not expressly

defined, it clearly covers the changes in fuel and increases in production rate at issue

here-- that would otherwise have been prohibited by a federally enforceable permit

limit.   EPA's PSD regulations, and Wisconsin's SIP, exclude changes in fuel and

increases in production rate from the definition of "major modification" only when such

changes would not be prohibited by a federally enforceable limit.  40 C.F.R. §

51.166(b)(2)(iii); 45 Fed. Reg. 52676, 52730 (Aug. 7, 1980).  Since increases in production

rate or fuel change at units 1 and 2 would have been prohibited by the hourly CO limit

in the prior permit, those changes were prohibited by a federally enforceable limit and

are not exempt from the term "change in the method of operation."  Therefore, the

change in hourly CO emission limits constitutes a "modification" triggering PSD review

and lower particulate matter and visible emission limits for Units 1 and 2.  Wis. Admin.

Code ch. NR 405, §§ NR 415.06(2) and NR 431.05.

---

[4] Note that at 16 MMBtu/ton, the Unit should be burning less than this amount of coal per hour as a 1000
MMBtu/hour boiler.

Moreover, the CO emission limits from the prior Title V permit were used in the PSD permitting analysis for Weston Unit 4 — a new coal-fired power plant on the same site. WPSC's PSD permit application contained emission rates for each emission source. WPSC stated the CO emission rates for Unit 1 and Unit 2 as 30.80 and 35.90 pounds per hour, respectively. PSD Permit Application for Weston Unit 4, Appendix C: Emission Calculations (attached hereto as Ex. Q, p. 2). The DNR's Analysis and Preliminary Determination for the Weston 4 PSD permit incorporated the same maximum emission rates for the two boilers as a part of DNR's basis for granting the PSD permit for Unit 4. Wisconsin Department of Natural Resources, Analysis and Preliminary Determination for the PSD Permit for Weston Unit 4, p. 91 (attached in relevant part hereto as Exhibit R); Memorandum from John Roth to Raj Vakharia, *Re: Revised Air Dispersion Analysis for a PSD Permit for the Wisconsin Public Service Corporation Weston Generating Station-Rothschild (Marathon County)- North Site*, p. 267 (attached hereto in relevant part as Exhibit S). Because the prior hourly CO limits for units 1 and 2 were included as specifications for review of the PSD permit for Weston Unit 4, the specifications became federally enforceable limits. 40 C.F.R. § 52.21(r)(1) (requiring the modified source to operate according to its PSD permit application). In *Hawaiian Elec. Co., Inc. v. EPA*, the Ninth Circuit held that an increase in a permitted emission rate, which was relied upon when issuing other PSD permits, must go through PSD review because it changes the air impact assumptions for such other permits. 723 F.2d 1440, 1448-49 (9th Cir. 1984). Similarly, in EPA's 1980 PSD rules, EPA explained that "any change in... rate of operation that would disturb a prior assessment of a source's environmental impact

should have to undergo [PSD] scrutiny."  45 Fed. Reg. 42,676, 52,704 (1980).  Because the

increase in CO emissions allows an increase in production rate and/or a change in fuel,

and the prior CO limits were relied upon when issuing a PSD permit for Weston Unit 4,

the emission increases are unlawful unless authorized by preconstruction permits.  The

Administrator must object.

    B.    <u>Increases In Allowable Emissions Of Particulate Matter, Carbon Monoxide and
Nitrogen Oxides From the Combustion Turbines</u>.

       The Permit includes an increase in the PM/PM10, CO, and Nitrogen Oxide

(NOx) emissions from three combustion turbines (B11, B12 and B13).  These increases

are not exempt from requirements for preconstruction permitting, but DNR did not

require a preconstruction permit for the emission increases.  Therefore, the

Administrator must object to the increased emission limits for the combustion turbines.

       *a.  Increase in PM/PM10 Limits.*

       The prior Title V permit limited operation of B11 to 4.74 pounds of PM/PM10

per hour.  Ex. P § I.E.1.(a).  The revised Permit increases the allowable emissions from

B11 to 25 pounds per hour.  *See* Ex. A p. 26.  The revised Permit also increases the

PM/PM10 limit for B12 and B13 from 5.21 pounds per hour, each, to 26.91 pounds per

hour, each.  *Compare* Permit 737009020-P02 §§ I.E.1.a. and I.F.1.a. *with* Ex. A pp. 29, 33.

Sierra Club's comments noted that such changes constitute a change in the method of

operation subject to PSD permitting[5] because "it allows the unit to operate more, operate at a higher rate, increase fuel consumption, and/or increase use of oil vs. gas." Ex. B p. 10. Moreover, Sierra Club noted that the change is not exempt from PSD permitting because "the changes would be prohibited by a federally enforceable permit condition limiting PM and PM10 emissions." *Id.*

DNR responded to Sierra Club's comments by disagreeing that the change constitutes a "change in the method of operation." Ex. C p. 2 ¶ 13. Instead, DNR asserts that "[t]he proposed changes are based on recent test data for the turbines." *Id.* DNR's response does not address the issue: whether the increase in hourly emissions results in an increase in production rate or a change in fuel. Previously, the 4.74 lb/hour and 5.21 lb/hour limits on PM/PM10 from B11, B12, and B13 acted to limit the fuel that could be burned and the operating rate of the combustion turbines. For example, DNR assumes emission of 0.023 lb/MMBtu when firing natural gas and 0.063 lb/MMBtu for distillate oil in B12 and B13. Ex. A, pp. 26, 33. The turbines, therefore, could have limited production to 226.6 MMBtu/hour when burning gas and complied with the 5.21 lb/hour limit.[6]

Moreover, the prior PM/PM10 limits for B11, B12 and B13 were included in WPSC's application for Weston Unit 4 and were relied upon by DNR when issuing a PSD permit for Weston Unit 4. Ex. Q, p. 4 (application for Weston 4 using prior permit

---

[5] The PM/PM10 increase from 4.74 lb/hour in the prior Title V permit to 25 lb/hour in the proposed Permit results in a 55.3 TPY increase (even assuming the 455 hour/month limit in the Permit). This is a major increase pursuant to Wis. Admin. Code § NR 405.02(27)(a)4. and 5.

[6] 0.023 lb/MMBtu * 226.6 MMBtu/hour = 5.21 lb/hour.

limits for PM/PM10); Ex. S, p. 267 (PM emission rates for S11, S12 and S13 assumed to

be 4.74 lb/hour, 5.21 and 5.21 lb/hour, respectively).  These limits cannot be changed

without PSD review.  *Hawaiian Elec. Co.*, 723 F.2d at 1448-49; 45 Fed. Reg. at 52,704.

Therefore, the increased hourly emission rate is effectively an increase in production

rate, or a change in fuel from gas to oil—either of which constitutes a "change in the

method of operation" subject to PSD permitting, as stated above for the increase in CO

emission from units 1 and 2.

       b.  *Increase in Carbon Monoxide Emissions.*

Additionally, the Permit increases the CO limits for B11, B12 and B13.  The prior

permit limited CO emissions from B11 to 1.30 lb/hour (32.39 lb/hour when firing

natural gas) and from B12 and B13 to 35.59 lb/hour.  Ex. P §§ I.D.5.a., I.E.5.a, and I.F.5.a.

However, the proposed Title V permit increases the hourly CO emissions to 216.25

lb/hour for B11 and 176.6 lb/hour, each, for B12 and B13.  Ex. A pp. 28, 32, 36.  This

change also constitutes a change in the method of operation of the combustion turbines

because CO emissions are directly related to production rate and fuel.  U.S. EPA, AP-42

Emission Factors, Fifth Edition, Section 3.1, Table 3.1-2a; Ex. A pp. 28, 32, 36 (emission

factors for CO emissions when burning oil and gas).  The units could comply with the

prior permit limit by liming operation.  The increased hourly CO emissions effectively

increases the allowable production rate and allows a more-polluting fuel to be burned.

For example, B11 could comply with it prior CO limit by operating at 15.9

MMBtu/hour when burning gas[7], or 394 MMBtu/hour when burning oil.[8]  Similarly,

B12 and B13 could comply with the prior 35.59 lb/hour CO limit by limiting operation

to 90.9 MMBtu/hour when burning gas[9] or by burning only distillate oil.[10]  Notably,

here too, WPSC's application for a PSD permit for Weston 4 and DNR's review of that

application relied on the prior CO emission limits for B11, B12 and B13.  Ex. Q, p. 4; Ex.

S, p. 267.  Therefore, the increase in the hourly emission rate allows greater production

rates, which results in a significant increase in emissions.  Even assuming the 455

hour/month operating limit in the Permit, the modification allowed by the proposed

Permit results in an annual CO emission increase greater than 500 TPY.

> c.  *Increase in Nitrogen Oxide Emissions.*

The Permit increases the allowable emissions for NOx from B12 and B13.  The

prior Title V permit limited NOx emissions from each unit to 138.88 lb/hour when

firing natural gas and 381.9 lb/hour when firing fuel oil.   Permit 737009020-P02 §§

I.E.4.a. and I.F.4.a.  However, the proposed Permit increases the NOx limits for these

units to 212.7 pounds per hour when firing gas and 411 lb/hour when firing oil.  Ex. A

pp. 31, 35.  Again, hourly emissions are directly proportional to fuel use and production

rate.  AP-24 Emission Factors, Fifth Edition, Section 3.1, Table 3.1-2a; Ex. A, pp. 31, 35

(establishing emission factors of 0.476 lb/MMBtu for gas and 0.947 lb/MMBtu for oil).

---

[7] Based on DNR's emission factor of 0.082 lb/MMBtu.  *See* Ex. A p. 28.

[8] Based on DNR's emission factor of 0.0033 lb/MMBtu for distillate oil.  *See* Ex. A p. 28.

[9] Based on DNR's emission factor of 0.392 lb/MMBtu.  Ex. A p. 32.

To comply with the prior permit limits, the combustion turbines were required to either burn gas or limit their operation to 157.8 MMBtu/hour when burning distillate oil. Therefore, hourly emission limits in the prior Title V permit limited production rates and fuel and the Permit's increase in hourly emission limits results in an increase in production rate and/or a switch in fuel use.

Because Wis. Admin. Code § NR 405.02(21)(b) only exempts increases in production rate and fuel changes that are <u>not</u> limited by a prior permit limit—the production rate increases and/or fuel changes allowed by the modifications in the proposed Permit are changes in the method of operation that are subject to PSD permitting. Furthermore, each of the prior permit limits was specifically relied upon by DNR when it conducted the PSD review for Weston Unit 4. Ex. Q; Ex. S, p. 267 (modeling inputs based on prior permit limits on NOx for S11, S12, and S13). Even though the proposed Permit also limits hours of operation for B12 and B13 to 73 hours per month, the change results in an increase greater than the "significance" threshold in Wis. Admin. Code § NR 405.02(21), the modification results in a major modification subject to PSD. Therefore, EPA must object to the modified (increased) NOx permit limits unless and until the increase is permitted pursuant to PSD. 40 C.F.R. § 52.21(r)(1); 45 Fed. Reg. at 52,704 (a permitted production rate and fuel relied upon in a prior PSD review should only be increased through PSD permitting); *Hawaiian Elec. Co.*, 723 F.2d at 1448-49 (same).

---

[10] Using DNR's emission factor of 0.043 lb/MMBtu and the unit's maximum hourly capacity of 434 MMBtu/hour. Ex. A p. 32.

**7. The Administrator Must Object Because Units 1 and 2 Underwent Major Modifications Without PSD Permit Review.**

Sierra Club's comments on the Permit noted that the Permit "fails to assure compliance by the source with all applicable requirements, and fails to include a compliance schedule for requirements for which the facility will not be in compliance when the final permit is issued." Ex. B p. 15 (citing 42 U.S.C. §§ 7661b(b), 7661c(a); 40 C.F.R. §§ 70.1, 70.5(c)(8)(iii); Wis. Admin. Code §§ NR 407.09(4)(b), (h)3.c.). Specifically, Sierra Club noted that Units 1 and 2 underwent physical changes—replacement of economizers and superheater—without a PSD permit. Ex. B pp. 16-23. These physical changes result in significant emission increases under either the actual-to-potential[11] or actual-to-future-actual tests. *Id.* pp. 18-22.

DNR did not directly address Sierra Club's comment. Instead, DNR's response to comments states:

> The Department has not made a finding that the Weston facility has violated PSD or NSPS requirements nor has the facility reported to the Department that such violations have occurred. If such a finding is made in the future, then the Department will take appropriate actions to revise the operation permit as needed. Without a finding of violation, the Department will not be including a compliance plan or other requirements pertaining to PSD or NSPS.

---

[11] Since WPSC did not submit the annual reporting necessary for it to take advantage of the "WEPCo Rule" (actual-to-projected-actual test), the actual-to-potential test applies. This is the test that U.S. EPA applies when the facility fails to conduct the monitoring and reporting necessary to take advantage of the WEPCo Rule. *See United States v. Duke Energy Corp.,* Slip Op. p. 47 n. 17 (M.D.N.C. August 26, 2003) (noting that EPA's briefing argues that the actual to potential test applies). Additionally, at least one of the modifications occurred prior to July 21, 1992, the date the "WEPCO Rule" became effective, so the WEPCo Rule does not apply to that modification. 57 Fed. Reg. 32314 (July 21, 1992).

Ex. C. p. 3.  In other words, DNR neither concurred, nor disagreed that PSD violation

have occurred at the Weston Generating Station.  Rather, DNR noted that it has not

made a decision either way.  This is an insufficient response.  *See In re Midwest*

*Generation, LLC, Fisk Generating Station*, Objection pp. 5-6 (Adm'r March 25, 2005)

(objecting to permit issued by Illinois EPA for failing to address Sierra Club's significant

comments regarding likely New Source Review/PSD violations).

A "major modification" is: "any physical change in or change in the method of

operation of a major stationary source that would result in a significant net emissions

increase of any air contaminant subject to regulation under the [Clean Air Act]."  Wis.

Admin. Code § NR 405.02(21); *In re Tennessee Valley Authority*, 9 E.A.D. 357, 388 (EAB

2000) (*citing WEPCo. v. Reilly*, 893 F.2d 901, 907-09 (7th Cir. 1990)).  The term "physical

change" is very broad, applying to almost any activity done at the facility.  *Ohio Edition*,

276 F.Supp.2d at 854; *New York v. EPA*, 443 F.3d 880, 884-85, 887 (D.C. Cir. 2006).[12]

---

[12] A routine maintenance, repair, or replacement, by itself, is not a modification.  However, very few physical changes are routine, and must meet a four-factor test including the nature, extent, purpose, frequency and cost of the work. *WEPCo.*, 893 F.2d at 910 (*quoting* Sept. 9, 1988 Memorandum from Don R. Clay, USEPA, to David A. Kee, "Applicability of Prevention of Significant Deterioration (PSD) and New Source Performance Standards (NSPS) Requirements to the WEPCO Power Company Port Washington Life Extension Project.").  Moreover, [r]outine maintenance, repair, and replacement occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense.  In contrast to routine maintenance stand capital improvements which generally involve more expense, are large in scope, often involve outside contractors, involve an increase of value to the unit, are usually not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet." *Ohio Edison*, 276 F.Supp. 2d at 834 (citations omitted).  Routine maintenance must be interpreted as very narrow. *U.S. v. So. Ind. Gas & Elec. Co.*, 245 F.Supp.2d 994, 1009 (S.D. Ind. 2003) ("Giving the routine maintenance exemption a broad reading could postpone the application of NSR to many facilities, and would flout the Congressional intent evinced by the broad definition of medication.").  None of the modifications addressed in these comments are routine.  Moreover, it is WPSC's burden to prove the application of the routine maintenance exemption and WPSC has never asked for a DNR determination, nor proven the application of the routine maintenance exception. *Ohio Edison*, 276 F.Supp.2d at 855; *In Re Tennessee Valley Authority*, Order Regarding Scope of the Record, the Standard of Review, and Allocation of the Burden of Proof at 25 (E.A.B. July 3, 2000).

According to WPSC's statements, under oath, to the U.S. EPA, WPSC made the following modifications:

| UNIT | CHANGE | DATE |
|------|--------|------|
| Pulliam 7 | Replace Secondary Superheater and Outlet Header | October 1986 |
| Pulliam 8 | Air Heater Rotating Element | February 1986 |
| Pulliam 7 | Replace Reheater | September 1999 |
| Pulliam 8 | Replace Outlet Section of Reheat Tubes | December 1988 |
| Pulliam 8 | Superheater Replacement | January 1994 |
| Pulliam 8 | Secondary Superheater & Waterwall Replacement | January 1994 |
| Pulliam 5 | Secondary Superheater Bank | February 1995 |
| Pulliam 7 | Replace Economizer | April 1982 |
| Weston 1 | Replace Economizer | February 1990/March 1991 |
| Weston 2 | Replace Economizer & Secondary Superheater | November 1993 |

*See* WPSC Resp. to U.S. EPA § 114 Request, June 28, 2002 (attached as Exhibit W, page 10). Additionally, WPSC disclosed in documents produced to U.S. EPA that it replaced a lower pressure cylinder seal on Weston Unit 1 in 1987, which WPSC identified as necessary to keep the unit in service. *See* WPSC 1987 Life Extension Plan at pp. WP2-6-01235 to 1236 (attached as exhibit). There is no question that the replacement of the economizer on unit 1, replacement of the economizer and secondary superheater on unit 2, and replacement of the lower pressure cylinder seal on unit 1 constitute "physical changes" under the broad meaning of that term. *New York*, 443 F.3d at 887. Therefore, whether these changes are subject to PSD permitting depends on whether they lead to a significant net increase in emissions. *Id.* at 887 ("only physical changes that do not result in emission increases are excused from NSR.").

Under either the actual-to-potential test or the actual-to-future-actual test, the modifications noted above result in significant net increases that trigger PSD. Units 1 and 2 operate significantly below their potential annual emission levels. Therefore, any physical change would cause a significant emission increase under the actual-to-potential test. Moreover, under the actual-to-future-actual test, Unites 1 and 2 would need to increase hours of operation by less than 250 hours per year to result in a significant emission increase. Ex. B pp. 20-21. The evidence submitted by Sierra Club with its permit comments demonstrated that such an increase in operating hours occurred. The replaced parts (economizers on both units and the Unit 2 superheater) were causing recurring forced outages during the period preceding the modification. Specifically, Unit 1 experienced 1727.8 hours of forced outages due to boiler problems during the 24 months preceding the replacement of the economizer on that unit. Ex. B pp. 20-21. In fact, WPSC's internal planning documents admit that the company expected the replacement of Unit 1's economizer to reduce forced outage by approximately 1691 hours annually. *See* Ex. B p. 21; WPSC Pulliam and Weston 1 Life Assessment Study, July 1987 at p. WP2-6-00050, WP2-6-00069, WP2-6-00161 (attached hereto as Exhibit T). This expected increased annual operation causes a significant increase of NOx and SO2. Similarly, Unit 2 experienced 3794.5 hours of forced outage due to boiler problems in the 24 months preceding the November, 1993 replacement of the economizer and superheater. *See* Ex. B p. 21; Weston Unit 2 Data Sheets (attached hereto as Exhibit U). Regaining even a small fraction of this time would result in a significant increase in annual emissions.

Sierra Club's comments also pointed out that WPSC has undertaken a number of modifications at the Weston Generating Station that were necessary to allow it to burn lower-sulfur western coal, including upgrades to the pulverizers, flue gas conditioning, and precipitator upgrades. Ex. B p. 21. WPSC's own documents state that the company changed these parts to allow it to burn low sulfur coal to comply with acid rain requirements. *See* Fossil Plants- Enhanced Maintenance Program, March 8, 1991 at p. WP2-6-01344 (attached as Exhibit V). Because low sulfur western coal contains higher ash content, switching to western coal results in increases in particulate matter emissions. WPSC never obtained a construction permit for the modifications made to allow burning western coal and, consequently, increased particulate matter emissions.

For each of these reasons, WPSC triggered PSD and NSPS permitting requirements at Weston. The final permit must include a compliance schedule by which WPSC will comply with PSD, including but not limited to, submitting a complete PSD permit application. Moreover, because each of the modifications also triggers the lower PM and visible emission limits in NR 415.06 and 431.05, those limits constitute the maximum emission limit that can be included in the final permit for Weston. If DNR had required the necessary PSD permit for the modifications identified above, lower emission limits for all criteria pollutants would apply. DNR never responded to Sierra Club's comments on these issues. The Administrator must object because of DNR's failure to respond and because the Permit fails to include applicable PSD requirements.

8. **The Administrator Must Object Because Weston Generating Station Has Unaddressed Opacity (Visible Emission) Violations.**

The Administrator must also object because the Permit does not assure compliance by the source with visible emission limits and fails to include a compliance schedule to bring the source into compliance with visible emission standards. 42 U.S.C. §§ 7661b(b), 7661c(a); 40 C.F.R. §§ 70.1, 70.5(c)(8)(iii); Wis. Admin. Code §§ NR 407.09(4)(b), (h)3.c.

> 40 C.F.R. §§ 70.5(c)(8)(iii)(C) and 70.6(3) require that if a facility is in violation of an applicable requirement and it will not be in compliance at the time of permit issuance, its permit must include a compliance schedule that meets certain criteria. For sources that are not in compliance with applicable requirements at the time of permit issuance, compliance schedules must include a 'schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance.' 40 C.F.R. § 70.5(c)(8)(iii)(C).

*In re Midwest Generation, LLC, Waukegan Generating Station*, Order Responding to Request that the Administrator Object to Issuance of a State Operating Permit p. 4 (Adm'r, September 22, 2005) ("Waukegan").

Sierra Club's comments demonstrated that the facility had ongoing visible emission violations and violations of monitoring requirements. Ex. B pp. 25-26. Sierra Club also included excess emission reports wherein the company certified, under oath, that it had violated the visible emission standards. *Id.* However, DNR did not address the comment and did not include a compliance schedule to bring the facility into compliance. Instead, DNR responded: "The Department has not issued a Notice of

Violation (NOV) to WPSC for emissions in excess of established opacity limitations nor for excessive downtime for the continuous opacity monitor identified in these comments. Without a finding of violation, the Department will not be including a compliance plan or other requirements pertaining to the continuous opacity monitor." Ex. C p. 3. This in an insufficient response and the Administrator must object because the Permit does not satisfy the requirements of 42 U.S.C. §§ 7661b(b), 7661c(a), 40 C.F.R. §§ 70.1, 70.5(c)(8)(iii) and Wis. Admin. Code §§ NR 407.09(4)(b), (h)3.c. Waukegan, supra, p. 4 (objecting to a permit where state permitting agency failed to respond to public comments regarding the necessity for a compliance schedule for opacity violations). As a result of DNR's failure to include a compliance schedule, the source will continue to emit excess visible emissions into the ambient air affecting Sierra Club's members.

### 9. CONCLUSION

For the foregoing reasons, the permit fails to meet federal requirements in numerous ways. These deficiencies require that the Administrator object to issuance of the permit pursuant to 40 C.F.R. § 70.8(c)(1). Each of the issues raised by Sierra Club in this petition result in a deficient permit. Most of the deficiencies result in unlawful emissions of air pollutants that negatively affect the health and welfare of Sierra Club members. Others result in illegal monitoring and reporting that make it difficult for Sierra Club to monitor and enforce air pollution limits applicable to the Weston Generating Station.

Dated this 20th day of November, 2006.


                                    Attorneys for Sierra Club
                                    GARVEY MCNEIL & MCGILLIVRAY, S.C.


                                    David C. Bender


                                    SIERRA CLUB
                                    Bruce E. Nilles

## BEFORE THE ADMINISTRATOR

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

In the Matter of an Air Pollution Control
Operating Permit for Wisconsin Public Service
Corporation's Weston Generation Station in
Marathon County, Wisconsin.

Source I.D. 737009020

Permit 737009020-P02

Proposed by the Wisconsin Department of
Natural Resources on September 28, 2006.

## CERTIFICATE OF SERVICE

STATE OF WISCONSIN    )
                      ) ss
COUNTY OF DANE        )


     I make this statement under oath and based on personal knowledge.  On this day
I caused to be served upon the following persons a copy of Sierra Club's Petition to the
United States Environmental Protection Agency regarding the Weston Generating
Station, via Certified Mail, Return Receipt Requested:

        Stephen L. Johnson
        US EPA Administrator
        Ariel Rios Building
        1200 Pennsylvania Avenue, N.W.
        Washington, DC 20460

        P. Scott Hassett
        Wisconsin Dept. of Natural Resources Secretary

101 S Webster St
PO Box 7921
Madison, WI 53707-7921

Weston Generating Station
Wisconsin Public Service Corporation
2501 Morrison Ave.
Rothschild, WI 54474

Wisconsin Public Service Corporation
700 N. Adams St.
P.O. Box 19001
Green Bay, WI 54307-9001

Dated : November 20, 2006

_Laura Boyd_
Laura Boyd

Signed and sworn to before me
This 20th day of November, 2006.

Notary Public, State of Wisconsin
My commission is permanent.

37

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Civil Action No. 1:07-cv-1040-ESH |
| STEPHEN L. JOHNSON, in his | ) | |
| official capacity as Administrator, | ) | |
| United States Environmental | ) | |
| Protection Agency | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF RICHARD WENTZEL IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      My name is Richard Wentzel.

2.      I am a dues paying, lifetime member of the Sierra Club.

3.      I live at 1531 Cedar Hedge Rd., Edgar, WI  54426-9372. My home is about fifteen miles from Weston Generating Station.  I have no plans to move.

4.      It is important to me that the Title V operating permit for the Weston Generating Station comply with the applicable laws because I regularly use and enjoy areas, including the property that I own, and the park in Rib Mountain, that are, and will continue to be, adversely impacted by pollution from the Weston Generating Station.  Stephen Johnson's failure to respond to Sierra

Club's petition to object to the issuance of the operating permit for Weston Generating Station delays Sierra Club's ability to ensure that the operating permit satisfies the requirements of the Clean Air Act, including the requirement that the plant monitor and report its emissions. This creates uncertainty for me as to whether the Weston Generating Station is emitting more pollution than is legally allowed. Also, because I understand that the permit issued to the Weston Generating Station is not sufficient, should require lower pollution limits, and Stephen Johnson has not objected to the deficiencies, I am concerned that the plant is not operating in accordance with the law and is emitting more pollution than it should.

5.      I regularly visit the area around the Weston Generating Station, including regular trips to Wausau and Rib Mountain. I regularly see pollution coming from the Weston Generating Station. I will continue to see the plant and its pollution regularly in the future and I find the plant and its emissions very ugly and aesthetically displeasing.

7.      I enjoy spending time outdoors. I enjoy trips to the state park near the Weston Generating Station and to Wausau and Rib Mountain.

8.      From reports in the media, I am aware that coal-fired power plants like the Weston Generating Station contribute to concentrations of pollution like ground level ozone and fine particulate matter in the air that are associated with serious health effects, including problems with lung function, cardiovascular problems, asthma and other respiratory illness. Because I live close to the Weston Generating Station, and regularly visit, shop, work, and recreate even closer to the Weston Generating Station, and because I spend a lot of time outside, I am concerned that the air pollution has harmed and will continue to harm my health. This is especially true because I understand that the permit for the Weston Generating Station is deficient and Stephen

2

Johnson's delay in responding to Sierra Club's petition is preventing a better, more protective permit.

Pursuant to 28 U.S.C. § 1746, "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

 

__July 9, 2007_____        _____s/ Richard Wentzel_____
Date                                Richard Wentzel

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Civil Action No. 1:07-cv-1040-ESH |
| STEPHEN L. JOHNSON, in his | ) | |
| official capacity as Administrator, | ) | |
| United States Environmental | ) | |
| Protection Agency | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The parties, having come before the Court on Plaintiff, Sierra Club's Motion for

Summary Judgment pursuant to Federal Rules of Civil Procedure 56(a) and (d) and

Local Rules 7 and 56.1, the Court finds that there are no contested issues of material

fact and that Plaintiff is entitled to summary judgment.

IT IS ORDERED that judgment be entered for Plaintiff.

IT IS FURTHER ORDERED that within 20 days of this Order, Defendant shall

respond to Plaintiff's November 20, 2006, submitted pursuant to 42 U.S.C. §

7661d(b)(2) and 40 C.F.R. § 70.8(d), regarding the Weston Generating Station in

Marathon County, Wisconsin.

Plaintiff may submit a petition for fees and costs, pursuant to 42 U.S.C. § 7604, within 60 days of this Order.


Dated: July 20, 2007

By the Court


_____
Hon. Ellen S. Huvelle
United States District Court Judge